UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| DANIEL P. HENDRICKSON,<br><br>Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL, ACTING<br>COMM'R OF SOCIAL SECURITY;<br><br>Defendant. | 4:17-CV-04173-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

Table of Contents

INTRODUCTION ........................................................................................ 1

FACTS ...................................................................................................... 2

    A.    Background and Administrative Overview ........................................... 2

    B.    The Medical Evidence. .......................................................................... 4

    C.    Evidence at the Hearing ...................................................................... 18

        1.    Mr. Hendrickson's Hearing Testimony ........................................... 18

        2.    The Vocational Expert's Testimony ................................................. 24

    D.    Post-Hearing Interrogatories ............................................................... 26

        1.    Interrogatories to Thomas Audet, the VE ....................................... 26

        2.    Interrogatories to John L. Alpar, M.D., an Ophthalmologist ............ 32

    E.    ALJ's Decision ...................................................................................... 36

        1.    Step One ............................................................................................. 36

        2.    Step Two ............................................................................................. 36

        3.    Step Three .......................................................................................... 36

        4.    Step Four ............................................................................................ 37

        5.    Step Five ............................................................................................. 42

    F.    Mr. Hendrickson's Assignments of Error ........................................... 43

DISCUSSION ................................................................. 44

  A.   Standard of Review. ............................................... 44

  B.   The Disability Determination and the Five-Step Procedure. ................ 45

  C.   Burden of Proof. .................................................... 47

  D.   Did the ALJ Err by Failing to Obtain Professional Assistance to Assess the Impact of Mr. Hendrickson's Mental Impairments? ........... 48

  E.   Did the ALJ Err in Assessing Mr. Hendrickson's Credibility? .............. 63

  F.   Did the ALJ Correctly Determine Mr. Hendrickson's RFC? ................ 73

    1.   The Law Applicable to Determination of RFC ................................ 73

    2.   Application of the Law to the ALJ's Decision .................................. 76

  G.   Did the ALJ's Decision at Step Five Comply with the Law? ................ 79

    1.   Did the ALJ Err in Determining a Significant Number of the Jobs Listed at Step Five Existed? .................................................. 79

    2.   Did the Record Lack Substantial Evidence to Support the Mental RFC after the ALJ Dismissed the Functional Limitation Opinions of the Psychiatrist and Psychologist? ............................. 84

    3.   Did the Jobs Found by the ALJ at Step Five Match the RFC? ......... 84

    4.   Did the Jobs Identified by the ALJ Require Accommodation? .......... 88

  H.   Type of Remand ................................................... 89

CONCLUSION ............................................................. 91

# INTRODUCTION

Plaintiff Daniel P. Hendrickson seeks judicial review of the Commissioner's final decision denying his application for disability insurance benefits under Title II and supplemental security income under Title XVI of the Social Security Act.[1] Mr. Hendrickson has filed a complaint and now moves to reverse the Commissioner, requesting the court to reverse the Commissioner's final decision denying him disability benefits and to grant an award of benefits outright without remanding to the agency.  In the alternative, Mr. Hendrickson seeks an order reversing and remanding to the agency for a *de novo* hearing.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g).  The parties have

---

[1]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled.   The definition of disability is the same under both Titles.  The difference--greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history.  There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.  Title II benefits may include a 12-month period of benefits retroactive to the date of application; Title XVI benefits are not retroactive to the application date.  SSR 83-20.  There are corresponding and usually identical regulations for each type of benefit.  See e.g. 20 C.F.R. § 404.1520 and § 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI).  In this case, Mr. Hendrickson filed his application for both types of benefits.  AR211-12, 218-21.  His coverage status for SSD benefits expired on September 30, 2018. AR28.  In other words, in order to be entitled to Title II benefits, Mr. Hendrickson must prove he was disabled on or before that date.

consented to this magistrate judge resolving the case pursuant to 28 U.S.C. § 636(c). Based on the facts, law and analysis discussed in further detail below, the court remands for further consideration at the agency level by the Commissioner.

**FACTS**

Mr. Hendrickson provided a detailed statement of the facts in the record. See Docket No. 17 at pp. 3-17. The Commissioner provided a very summary version of facts. See Docket No. 18 at pp. 3-6. The below set of facts is drawn primarily from the plaintiff's facts with supplementation from the Commissioner's statement where there is a variance, and supplementation by the court.

## A. Background and Administrative Overview

Daniel Hendrickson was born in 1982, one of five children. AR219, 749. He grew up a "military kid" who moved around the country and abroad. His father retired and the family settled in Sioux Falls. Daniel finished high school in 2000, attempted college, but dropped out. AR56, 749, 752. He then worked in 14 jobs. AR268-70. Daniel has never married and has no children. AR737. He has tried apartment-living but eventually moves home. AR749. He did Mormon missionary work[2] and became quite homesick but got through it. AR752. Since 2010 he has lived in his parents' home in Sioux Falls with his brother and sister and her children. AR3, 219.

---

[2] Perhaps in 2002. AR268.

Mr. Hendrickson worked at Kmart, Best Buy, Raven Industries, West Telemarketing, C&A Industries, Oriental Trading, Robert Half Corporation, Noll Inc, Quest Corporation, Asurion, Citibank, Wells Fargo, and a temporary Manpower service.  AR268-70.  He was "on the phones in some type of call situations from 2005 to 2013.  He [has] a headset and takes incoming calls which can be pretty frequent and average a length of 10-12 minutes."[3]

Mr. Hendrickson filed for concurrent benefits on September 23, 2014, alleging disability since May 28, 2013.  AR211-12, 218-21.  In his Disability Report, he alleged disability due to Bell's palsy, and keratoconus (left eye worse, right less progressive).  AR302.

The agency decided Mr. Hendrickson last worked on April 29, 2013, when he stopped work at Citibank.  AR299.  A subsequent job at Wells Fargo which continued on and off from August 19, 2013, to May 24, 2014, was deemed by the agency to be an unsuccessful work attempt.  AR298.  The agency denied Mr. Hendrickson's claims initially and on reconsideration.  AR122-26, 136-58.  The agency found no severe physical impairment, no medically determined mental impairment, and no need for a consultative examination.  AR88, 90-91, 109-10, 118.

---

[3] Plaintiff asserts in his brief, in error, that his first episode of Bell's palsy occurred in July, 2012, and that he was working from home at that time.  See Docket No. 17 at p. 4 (citing AR522, 525).  However, an MRI was ordered for plaintiff's July, 2012, symptoms and that MRI was *negative* for Bell's palsy.  See AR518-22.  The first time Bell's palsy is confirmed in plaintiff's medical records is May 13, 2013, the date he alleged his disability began.  See AR479-80, 616.  At that time, he was unemployed, having ended his employment with Citibank on April 29, 2013.  AR303.  In July, 2012, it appears he was working for NEW/Assurion in Rapid City.  AR58-59, 270, 303.

A hearing before Administrative Law Judge (ALJ) Christel Ambuehl was held on July 29, 2016. AR51-83. Mr. Hendrickson testified at the hearing as did the ALJ's vocational expert (VE), Tom Audet. Following the hearing, Mr. Audet and John Alpar, M.D., an ophthalmologist, responded to interrogatories propounded by the ALJ. AR369-80, 720-27. On January 6, 2017, the ALJ issued an opinion denying benefits. The Appeals Council denied Mr. Hendrickson's request for review, making the ALJ's decision the final decision of the agency.

**B.    The Medical Evidence.[4]**

Keratoconus[5], a corneal dystrophy[6], was diagnosed when Mr. Hendrickson was 18. AR398. It became problematic after Bell's palsy was diagnosed in 2013[7] and left him with eyelids that did not blink on the left side. AR479-80, 616.

---

[4] Conditions impacting work are listed in order of chronological appearance in the record.

[5] Keratoconus is a progressive eye disease in which the cornea thins, bulges, and becomes irregular in shape. https://www.allaboutvision.com/conditions/keratoconus.htm. All internet citations in this opinion were last checked Nov. 6, 2018.

[6] National Eye Institute, "Facts about Cornea and Corneal Disease," offers a straightforward explanation with images of eye anatomy, particularly the cornea. It explains the disordered anatomy and physiology of keratoconus. https://nei.nih.gov/health/cornealdisease.

[7] Plaintiff asserted 2012 in his brief, Docket No. 17 at p. 4. But see footnote 3, supra. Plaintiff's MRI in 2012 was negative. Bell's palsy was first confirmed in May, 2013. See AR478-80, 616.

He has longstanding[8] anxiety disorders and, in the last few years, recurrent major depressive disorder.  AR12, 748, 753.  Epigastric pain affecting concentration started in 2005 when Dr. Brett Baloun performed cholecystectomy[9] and took down abdominal adhesions.[10]  AR461, 482.  He has been diagnosed with irritable bowel syndrome.  AR535.  He has episodes of diarrhea.  AR465-66, 481-84, 488, 492, 494, 521-22, 524, 534.

The duration of his morbid obesity (AR470, 670-71, 677) is not shown in the record.  In April, 2013, a dietitian recorded height and weight as 6' 5" and 372 pounds, BMI 44.11.  AR483.  Associated with this, Mr. Hendrickson has obstructive sleep apnea diagnosed by Jean Lageson, MD, based on symptoms (sleep disturbance, ongoing fatigue, loud snoring, stops breathing, does not feel rested in the morning).  AR670, 699.  He has esophagitis ("I do think that his weight is contributing").  AR487-88.  His "Grade B reflux and reflux esophagitis[11]" found on EGD caused a voice disturbance when doing telephone

---

[8] Shelly Sandbulte, Ed.D, clinical psychologist, saw him six times (AR748) and opined that he had overwhelming anxiety as early as college.  AR749, 752.

[9] Post cholecystectomy pain occurs in 10% to 40% of patients, and has multiple potential causes, biliary and nonbiliary.
https://www.mdedge.com/ccjm/article/95487/gastroenterology/recurrent-abdominal-pain-after-laparoscopic-cholecystectomy.

[10] Likely related to his cholecystitis and/or appendicitis.  AR482.  "Abdominal surgery is the most frequent cause of abdominal adhesions.  Other causes of abdominal adhesions include inflammation of an organ such as cholecystitis or appendicitis...."
https://www.medicinenet.com/abdominal_adhesions_scar_tissue/article.htm.

[11] The Los Angeles system of gradation describes "Grade B" esophagitis as "one or several erosions limited to mucosal fold(s) and larger than 5 mm in extent" [portraying an example].  https://www.endoscopy-

work.  AR488-89, 502, 505, 507, 512, 525-26.  Likely related to morbid obesity, he has a fatty liver.[12]  AR487, 492.  His overloaded spine and hips[13] show altered physiological joint motion-reduced femoral-acetabular internal and external rotations and reduced trunk rotation, and overactive thoracolumbar back extensors, hip flexors and tensor fascia lata.  AR468.  Consistent with morbid obesity, Mr. Hendrickson reported decreased endurance and function.[14]  AR74, 317.

---

campus.com/en/klassifikationen/los-angeles-klassifikation-zur-einteilung-des-schweregrads-der-refluxoesophagitis/.

[12] "About 90 per cent of morbidly obese patients show histological abnormalities of the liver…. [M]orbid obesity alone may lead to severe disease showing all the features of alcoholic hepatitis."  Gastroenterol Clin North Am. 1987 June; 16(2):239-52.  Clain et al, "Fatty liver disease in morbid obesity." https://www.ncbi.nlm.nih.gov/pubmed/3319904.

[13] Effects of morbid obesity on systemic inflammation, mechanical stress, and muscle strength.  https://www.researchgate.net/figure/Physiological-forces-acting-on-the-low-back-and-load-bearing-joints-in-healthy-weight_fig1_258061245s.

[14] "Excess weight imposes abnormal mechanics on body movements, which could account for the high incidence of musculoskeletal disorders in these subjects.  This article reviews the physiological and biomechanical causes of the reduced work capacity in obese workers….  The reduction in work capacity appears to be due to … reduced spine flexibility, decay in endurance, limited range of movement of the major joints, reduced muscle strength and capacity to hold prolonged fixed postures, impaired respiratory capacity and visual control.  Work capacity in morbidly obese workers should always be evaluated to match specific job demands." *International Journal of Occupational Safety and Ergonomics (JOSE)* 2010, Vol 16, No. 4, 507-523.  Capdaglio et al, "Functional Limitations and Occupational Issues in Obesity:  A Review." https://pdfs.semanticscholar.org/06f0/aacfcf74cb939c1cd7a684cc561e314d271e.pdf.

His first episode of Bell's palsy[15] occurred in May, 2013, with symptoms including sharp left-face pain, blurred vision in the left, and left hand weakness.[16]  AR479-80, 616.  To this day he has residual palsy and neuropathic pain and spasms in his face, treated with chronic Cyclobenzaprine[17] (AR463, 471, 478, 637) which makes him drowsy (AR319).  His left eyelid still does not fully close.  The constant open eye exacerbates his keratoconus because the eye is exposed to the elements and pathogens and is poorly lubricated.

In mid-2012 Mr. Hendrickson told his family physician, Dr. Mark Rector at Family Medicine, he was concerned about anxiety and racing thoughts.  AR517.  He stated he worried about "random things."  Id.  Dr. Rector

---

[15] Bell's palsy occurs when the nerve that controls the facial muscles [7th cranial nerve] is swollen, inflamed, or compressed, resulting in facial weakness or paralysis....  Most scientists believe that a viral infection such as ... herpes simplex causes the disorder.  They believe that the facial nerve swells and becomes inflamed in reaction to the infection, causing pressure within the Fallopian canal and leading to ischemia.... Bell's palsy can interrupt the eyelid's natural blinking ability, leaving the eye exposed to irritation and drying."  Physical therapy, facial massage, or acupuncture may provide a potential small improvement.  "In a few cases, the symptoms may never completely disappear.  In rare cases, the disorder may recur, either on the same or the opposite side of the face."
https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Bells-palsy-Fact-Sheet.

[16] Plaintiff asserts the date of July, 2012, at page 6 in his brief, Docket No. 7.  But see footnote 3, supra.

[17] Cyclobenzaprine, a/k/a Flexeril is a skeletal muscle relaxant.  Side-effects include dizziness, nausea, and extreme tiredness.
https://medlineplus.gov/druginfo/meds/a682514.html.

prescribed Zoloft[18] (it made him "fuzzy-headed," AR319) and Klonopin[19] to calm down his racing thoughts.  AR518.  They did not help his "panic attacks." AR516-21, 752.  Dr. Rector offered a diagnosis and point of view.  "Anxiety … made worse by empty time.  He needs to go to work."  "[H]e has missed WEEKS of work for MULTIPLE complaints, which is abnormal by ANY employee standard.  Truly the cure for his anxiety is to get back to meaningful work each day."  AR517.  Dr. Rector did not then or ever refer his patient to a psychiatrist.

On October 3, 2013, Rebecca Larson, O.D., optometrist, noted Mr. Hendrickson's problem of blurry vision and dryness since onset of Bell's palsy. AR449.  Treatment attempts had included taping the lid shut.  He was sensitive to glare and light, had headaches, burning, dryness, eye pain or soreness, itching, redness, and blurred distant vision and near vision. Dr. Larson planned topography of the eye.  AR452.  She fit his left eye with a lens, but it was difficult to fit and "I was unable to take any of the 4 lenses out of his eyes."  AR455.  The technician took out two and the patient took out two. "After fitting these 4 lenses I decided to stop."  Id.  "John at Synergeyes … suggested pausing with fingers on lens edge before squeezing or trying rubber gloves/finger cots to help take the lens out."  AR456.  After wearing the lens a week, Mr. Hendrickson reported that his vision became blurry after two hours.

---

[18] Zoloft, a/k/a Sertraline, is a SSRI for depression and anxiety disorders. Side-effects include gastrointestinal effects, dizziness, tiredness, headache, and nervousness.  https://medlineplus.gov/druginfo.

[19] Klonopin, a/k/a Clonzazepam, is a benzodiazepine used to relieve panic attacks.  https://medlineplus.gov/druginfo/meds/a682279.html.

AR446.  On October 30, 2013, Dr. Larson said he was using drops and gel a lot to keep the left cornea from drying out.  The <u>right</u> eye lens was still pushing on the cornea; she could see striae.[20]  Bell's palsy kept him from blinking properly.  AR477.

Mr. Hendrickson asked Dr. Rector to recommend physical therapy for his problem blinking properly.  AR476.  Dr. Rector said, "Therapy is not needed for blinking."  AR477.

On November 4, 2013, Dr. Larson noted persistent eye problems.  AR440.  She tried one lens after another without success.  AR417-38.  Getting a contact lens to fit was not easy or simple.  AR429, 435, 438, 441.  Eye symptoms persisted: responses to glare, headaches, light sensitivity, burning, dryness, eye pain or soreness, itching, redness, blurred distant and near vision.  AR423, 426, 427, 429, 430, 440, 449.  (Plus there were "billing issues."  AR432, 435.)  When it seemed that a good fit had been achieved, vision was pretty good in the morning and a little like tunnel vision toward afternoon.  AR434.  By the end of December, 2013, Mr. Hendrickson had a better fit, but persistent responses to glare, headaches, light sensitivity, burning, dryness, eye pain or soreness, itching, redness, blurred distant and near vision.  AR426.

---

[20] Vogt's striae are vertical (rarely horizontal) fine, whitish lines in the deep/posterior stroma and Descemet's membrane commonly found in patients with keratoconus.
https://webeye.ophth.uiowa.edu/eyeforum/atlas/pages/vogts-striae.htm.
Also see *Scientific Reports*, October 2017, Article 13584. Grieve et al. "Stromal striae: a new insight into corneal physiology and mechanics."
https://www.nature.com/articles/s41598-017-13194-6.

The lens was "okay at first but the more he wears the lens the worse it gets." AR423.  He reported throbbing with the lens and poor vision.  AR424.

Then for a while in January, 2014, he was better and Dr. Larson released him to work.  AR423.  A week later he was worse again: Dr. Rector assessed double vision, keratoconus of left eye worse after Bell's palsy, and conjunctivitis headache.  AR476.  He reported conjunctivitis with drainage from the right eye.  Id.  He would "consider" ophthalmology.  Id.

On January 31, 2014, Dr. Larson said persistent symptoms as before. She told the patient not to wear contact lenses until his eyes cleared; then she would attempt over-refraction.  AR418-19.  Cross-linking[21] at Vance Thompson Vision was a potential treatment.  AR419.

On February 10, 2014, Dr. Larson said "I am going to call VTV to set the process in motion in regards to a referral to Dr. Schweitzer for further CL fitting."  AR417.  On February 17, 2014, at Vance Thompson Vision, Mr. Hendrickson underwent imaging to measure the corneal topography of his eyes.  AR388-95.  The specialist optometrist, Dr. Justin Schweitzer, noted he

---

[21] "This procedure is relatively new and was developed in Germany.... The procedure involves using Riboflavin drops in conjunction with ultraviolet light, to create 'cross links' in the corneal architecture to strengthen the cornea itself. This essentially stops the keratoconus from progressing, with evidence showing a reduction in the amount of irregularity resulting from keratoconus after this procedure.  Your doctor will normally offer this treatment with the aim of halting progression of keratoconus, prior to you requiring further contact lens fittings or corneal transplant."  http://seemaeye.com/services/corneal-ectasia-management/.  Corneal cross-linking aims to create new corneal collagen cross-links, shorten and thicken the collagen fibrils, and stiffen the cornea. https://www.livingwithkeratoconus.com/what-is-cross-linking/.

had not been able to get a good contact lens fit and had daily headaches lasting

all day.  Dr. Schweitzer noted the Bell's palsy (AR398); he did not measure the

degree of eye exposure due to non-closing eyelids.[22]  Two weeks later

Dr. Larson recorded that vision still fluctuated and eye symptoms persisted:

itchiness, burning, dryness, eye pain or soreness, light sensitivity, blurred

distant and near vision.  AR412.  The "OCT"[23] showed not enough clearance

between the cornea and lens; she planned to re-order the left scleral lens.

AR413.

Dr. Larson swapped out the lens, and on April 16, 2014, recorded how

Mr. Hendrickson was doing with his "Valley Scleral Lens."[24]  AR409-10.

"[W]hen he first puts it in, the vision is good but at half an hour everything

goes blurry.  If he just leaves it in, it does get better but then if he tries to wear

it all day the eye gets really bloodshot and 'hurts.' "  AR409.  She could see

inferior and nasal blanching at the edge of the lens.  The patient again left his

lens at the clinic and Dr. Larson planned to consult with another optometrist

---

[22] Dr. Alpar, a consultative ophthalmologist hired later by the ALJ, wrote, "the record unfortunately does not describe severity or measurement of exposure of the eyeball."  AR724.  He said this twice.  AR726.

[23] Optical coherence tomography.  See *Clinical and Experimental Optometry*, 2015; 98: 319-322.  Uzunel et al.  "Effects of rigid contact lenses on optical coherence tomographic parameters in eyes with keratoconus." https://onlinelibrary.wiley.com/doi/pdf/10.1111/cxo.12287.

[24] Scleral contacts are large-diameter gas-permeable contact lenses especially designed to vault over the entire corneal surface and rest on the "white" of the eye (sclera).  In doing so, scleral lenses functionally replace the irregular cornea with a perfectly smooth optical surface to correct vision problems caused by keratoconus and other corneal irregularities. https://www.allaboutvision.com/contacts/scleral-lenses.htm.

on the next lens to order. AR411. Dr. Haier suggested flattening the scleral zone by "1" to see if it helped the blanching and afternoon blur. AR408. On May 14, 2014, Dr. Larson reported the patient doing well, with the lens staying clear four to five hours. AR403. Dr. Larson released Mr. Hendrickson to work half-days "for now." AR405. It had been 12 months since onset of Bell's palsy. AR479.

On May 28, 2014, Mr. Hendrickson sought ER treatment for dizziness and intermittent headache since onset of Bell's palsy. "Severe anxiety" was reported in the history section of this medical record, but Mr. Hendrickson did not complain of any anxiety symptoms at this time. AR472.

On July 9, 2014, he had a 45-minute episode of right-face numbness after taking Flagyl[25] for diarrhea. Flagyl was the potential cause. AR463-64. (He still had left-face numbness. AR463.) On July 11, 2014, Douglas Feise, MD, of Family Medicine, diagnosed a second episode of Bell's palsy, this time on the right. AR462. On July 14, 2014, Mr. Hendrickson saw Dr. Rector. He reported stumbling and losing his balance. AR461. Dr. Rector noted difficulty smiling, squeezing his eyes shut, and a "large constellation of

---

[25] Metronidazole is an antibiotic, specifically, a nitroimidazole antimicrobial. https://medlineplus.gov/druginfo/meds/a689011.html. Neurotoxic effects have been hypothesized to occur via axonal swelling secondary to metronidazole-induced vasogenic edema. *Br J Clin Pharmacol,* 2011 Sep; 72(3): 381-393. Grill et al. "Neurotoxic effects associated with antibiotic use: management considerations." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3175508/.

symptoms. Could be related to Bell's palsy, also consider other etiologies. We have elected against further workup...." AR461-62.

On July 16, 2014, Mr. Hendrickson changed clinics. AR638. Emad Beshai, MD, of Avera Specialty Clinic, recorded a history of insomnia and depression. AR638. He ordered a Brain and Stem MRI, which confirmed right-side Bell's palsy. AR616. Dr. Beshai planned physical therapy.[26] AR639. On August 9, 2014, Mr. Hendrickson was somewhat better. He still had shooting pain and paralysis in his face. He had daytime fatigue warranting a sleep apnea study. AR643-44.

On December 2, 2015, Khalil Aloreidi, MD, Dr. Kevin Whittle's resident (AR691), recorded the history of Bell's palsy (pain level 8/10) on the left that did not resolve completely and subsequently on the right, resolving almost completely. AR692. "What is bothering him so much is the left-sided facial pain and the eye tearing and itching. Pain killers didn't help much...." Id. Palsy was observable on his lower left face; he had left eye redness and increased secretions. The treatment plan: artificial tears, cover the eye, take Gabapentin and see ophthalmology. AR693.

On December 30, 2015, Noura Elsedaway, Dr.Whittle's resident, said, "Bell's palsy on each side in the past 2 years ... left him with progressive bilateral visual disability and severe post-herpetic neuralgic left hemi-facial pain." AR689. He complained of depth-perception problems, stating "he misses things when ... trying to reach them." "His vision is rapidly

---

[26] Physical therapy reports are not in the record.

deteriorating." Id.  On exam he had tender, enlarged right occipital lymph nodes.  She assessed facial post-herpetic neuralgia.[27] Id.  All objective measures of depth perception were normal.  Id.

On January 6, 2016, Mr. Hendrickson saw Avera's Gregory Hill, OD. AR653.  Dr. Hill noted eye issues since onset of Bell's palsy.  Mr. Hendrickson told Dr. Hill that with his hard contact lens, visual acuity was good for four to five hours and then blurry.  AR654.  Dr. Hill's assessment and treatment plan (largely unreadable) include ptosis, neuralgia, keratoconus, blur and astigmatism with scleral lens, and OS fogging/deposits.  Dr. Hill recommended a different cleaning method.  He said the patient was without employment, car or health insurance.  Dr. Hill observed that Mr. Hendrickson "First has to deter[mine] how to afford Tx [treatment]."  AR654.  Dr. Hill noted Mr. Hendrickson was looking into disability, but Dr. Hill wrote "Pt ed[ucated] that [he] first need[s] to exhaust tx[treatment] options for keratoconus."  Id.

---

[27] Post-herpetic neuralgia occurs in the wake of a viral infection after the acute condition subsides, but residual pain persists.  See https://emedicine.medscape.com/article/1143066-overview.

On January 15, 2016, Dr. Aloreidi recorded continuing complaints of an electrical type of pain around his left eye.  He reported an opacity on the left cornea.[28] [29]  AR685.

In February, Dr. Aloreidi, working under Jean Lageson, MD, said the patient was struggling with facial pain, his Bell's palsy was complicated by neuropathic pain, he had increased trouble sleeping, pain was there all the time, and was worse after exposure to cold wind.  Dr. Aloreidi recorded, "Feels anxious all the time."  AR680.  The diagnosis was Chronic Neuropathic Pain, history of Bell's palsy.  Venlafaxine[30] was added to Nortriptyline.[31]  AR681.

In April, 2016, Mr. Hendrickson saw Dr. Lageson for left facial pain and right lower abdominal pain.  He weighed 384, with heart rate 99 and blood pressure 152/95.  AR673.  He had sleep disturbance, fatigue, and a history of

---

[28] Corneal opacity occurs when the cornea becomes scarred.  Corneal opacity may cause vision loss, eye pain, eye redness, tearing, or light sensitivity.  Scarring may be removed surgically using a laser, if scarring is close to the surface.  https://uvahealth.com/services/eye-care/conditions-treatments/corneal-opacity.

[29] The ALJ's ophthalmological expert, Dr. Alpar, reviewed the records and missed the report of corneal opacity, concluding, "the patient's keratoconus seems to be under the milder side, and no mention is made of any corneal scarring."  AR724.

[30] Venlafaxine, a/k/a Effexor, is a SNRI used to treat depression, generalized anxiety disorder, social anxiety and panic disorder.  https://medlineplus.gov/druginfo/meds/a694020.html.

[31] Nortriptyline is a tricyclic antidepressant used to treat depression and sometimes to treat panic disorders and post-herpetic neuralgia (the burning, stabbing pains or aches that may last for months or years after a shingles infection).  https://medlineplus.gov/druginfo/meds/a682620.html.

anxiety.  AR676.  She diagnosed anxiety and morbid obesity.  She increased his

Venlafaxine because he stated it seemed to help and inquired about obtaining a

higher dose.  AR677.  On May 17, 2016, Mr. Hendrickson's blood pressure was

162/96, and he had had a headache for a week.  AR668.  Dr. Lageson noted,

"He feels anxious all the time...."  AR670.  He appeared anxious, depressed and

fatigued; he had facial paralysis and chronic pain.  AR670-71.  She diagnosed

Depression/Anxiety, Obstructive Sleep Apnea, Fatigue, and Morbid Obesity.

She discussed his diet, encouraged exercise, and planned to refer to Sleep

Medicine.  AR671.

On May 31, 2016, Jamal Dodin, MD, Dr. Whittle's resident, recorded

ongoing symptoms and severe headache.  AR661.  "He feels anxious all the

time and he thinks because he is not getting enough sleep recently."  His

headache pain was worse for four or five hours in the morning.  AR662.  On

exam, he had left facial palsy, numbness, and sweating on the left side of his

face.  AR663.  Dr. Dodin prescribed Imitrex.[32]

On July 19, 2016, (AR697), ten days before Mr. Hendrickson's ALJ

hearing (AR51), Dr. Lageson opined that severe anxiety and chronic pain

resulted in marked limitations of ability to interact appropriately with the

public, supervisors, and co-workers.  AR696.  She assessed his ability to "make

judgments on simple work-related decisions" and to "respond appropriately to

usual work situations and to changes in routine work setting" as markedly

---

[32] Imitrex, a/k/a Sumatriptan, is used to treat migraines.
https://www.webmd.com/drugs/2/drug-11571/imitrex-oral/details.

restricted.  AR695-96.  She stated reasons: "severe anxiety & chronic pain make concentrating & remembering very difficult" (AR695); and "severe anxiety, self-conscious about facial weakness after an episode of Bell's palsy.  Rarely leaves home."  AR696.  She assessed his physical status as "significantly overweight & deconditioned.  By symptoms he certainly has Sleep Apnea & is beginning to develop pulmonary problems.  AR705.  She checked "none established" for visual limitations, perhaps meaning that she had not tested him.  AR701.

Dr. Lageson referred Mr. Hendrickson to Heather Chester-Adam, MD, Avera psychiatrist.  AR735.  On August 16, 2016, she reported his history of always having been somewhat anxious and shy; this had gotten worse when he developed Bell's palsy.  Id.  He worried about doctor appointments, family events, and going out in public.  He knew his face wasn't that noticeable but he worried and ruminated about that.  AR736.  He had decreased interest levels and decreased energy; outside interests were curtailed due to anxiety.  It took much effort to focus attention and concentration.  AR736.  He felt anxious all the time.  Dr. Chester-Adam diagnosed Generalized Anxiety Disorder.  AR739.  She added Clonazepam to his medications.  AR739. She opined, "I feel that with a combination of medication plus therapy, he could regain a lot of functionality and potentially re-enter the workforce."  AR739.  Dr. Chester-Adam referred Mr. Hendrickson to Shelley Sandbulte, Ed.D., a licensed psychologist, for therapy.  AR748.

Dr. Sandbulte saw Mr. Hendrickson six times.  AR756.  She wrote a long report describing his difficulty at college and work, anxious dependence on his parents, agoraphobic anxiety, and self-comforting behaviors.  AR749.  Dr. Sandbulte described his uneven activities of daily living, depending on if he was having a good day or had to force himself out of his bedroom.  AR751.  "Daniel's anxiety in the last years has escalated to panic attacks at times.  Daniel stays within the four walls of his bedroom/house in an attempt to avoid any social contact and for fear of having a panic attack."  AR752.  She diagnosed generalized anxiety disorder, social anxiety, major depressive disorder, recurrent, severe, without psychotic features, and a mood disorder NOS.  AR748.

## C.  Evidence at the Hearing[33]

### 1.  Mr. Hendrickson's Hearing Testimony

At the hearing, Mr. Hendrickson was 34 years old, six feet five inches tall, and weighed a typical-for-him 380 pounds.[34]  AR55-56.  Mr. Hendrickson graduated high school and had some college courses, but no degree.  AR56.  He had not been employed since 2013-14 when he worked full time for Wells Fargo bank as an over-the-phone banker.  AR56-57.  Mr. Hendrickson left this job

---

[33] Neither party set forth in detail the evidence from the ALJ hearing in their briefs.  Section C is the court's own summary of that evidence.

[34] Mr. Hendrickson's body mass index (BMI) was 45.1, which qualifies him as obese.  See https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm. Any BMI of 30 or greater places one in the obese category.  Id.

because he was placed on short-term disability and then was let go. AR57. The disability leave was due to his Bell's palsy and his keratoconus. Id.

Prior to Wells Fargo, Mr. Hendrickson worked for Citibank providing customer service over the phone. AR58. The Citibank position ended due to Mr. Hendrickson's Bell's palsy. Id. Prior to Citibank, Mr. Hendrickson provided technical support over the phone in Rapid City, South Dakota, for Direct TV for a company called National Electronics Warranty (NEW). AR58-59. The NEW job ended because Mr. Hendrickson wanted to move back home to Sioux Falls to be nearer his family. AR59.

Mr. Hendrickson testified that two primary things limited his ability to work on a full-time basis: his Bell's palsy and his keratoconus. Id. He was embarrassed by the effect Bell's palsy has had on his face and he found it really hard to go out in public. Id. He testified the left side of his face feels slightly off than what it used to be and was in pain, so he "can't deal with people being around or having to talk to them or see them." Id. Mr. Hendrickson was fidgety in the hearing, with his hands and feet moving constantly; he testified this was typical of how he was whenever he forced himself to be out in public. AR59-60.

When Mr. Hendrickson first experienced Bell's palsy, he could not move the left side of his face at all and there was significant pain along the left side, down the jaw line, and his eyes would not close right. AR60. Since the inception of Bell's palsy, Mr. Hendrickson has regained some movement, but the pain has not subsided and he still cannot blink normally. Id. The pain is

like a muscle spasm or charley horse and feels like a pinch or burning ache in his cheek area.  Id.  Medication has helped with the spasming, but the lower level pain is constant.  AR60-61.  The chronic pain is a "4" on a scale of 1-10, while the spasms are a "7" or an "8" when they occur.  AR61.  With medication, the spasms occur 2-3 times per day and last about a minute.  AR73.  He also gets headaches from the Bell's palsy of varying intensities.  AR66.  Sometimes he can address the headaches with Tylenol, but other times he has to lie down and stay in bed for a while.  Id.  He has bad pain 2-3 days per week; when they occur he lies in bed approximately 70 percent of the day.  AR74.  The constant pain interferes with Mr. Hendrickson's ability to concentrate and stay focused.  AR61.

The second factor limiting his ability to work was his vision impairment due to keratoconus.  AR59.  Without contacts, he cannot see well enough to read.  Id.  With contacts, a lot of matter and mucus builds up on the contacts because he is unable to close his eyes well and this requires him to frequently remove and clean his contacts.  Id.  His left eye was more affected than his right eye.  AR62.  Without contacts, Mr. Hendrickson cannot see anything with his left eye whether the object is near or far.  AR62.  His left eye cannot be corrected with eye glasses.  Id.  With a contact, his vision is still "pretty bad," but he could start to see, though not well enough to read.  Id.  With a contact in his right eye, he can read with that eye.  Id.  Mr. Hendrickson can see a computer screen by using his right eye only and blowing the font up to size 24

$[24]$ or 26 $[26]$.[35]  AR73.  He cannot see well enough to play video

games.  AR74-75.  He does not watch tv, but he listens to the news.  AR75.  He

occasionally listens to movies.  Id.  He also listens to books, music, and the

radio.  AR76.

Mr. Hendrickson has lived at home with his parents since 2010 because

he cannot be financially independent.  AR63-64.  He has no medical insurance.

AR64.  At the Avera free clinic, they have tried to assist Mr. Hendrickson obtain

medical care through coupons.  Id.

Mr. Hendrickson testified he has had issues with anxiety and

Dr. Lageson has been treating him for that by prescribing various medications.

AR64.  The medications help a little, but not enough.  Id.  Mr. Hendrickson told

the ALJ he had an appointment to see a psychologist in the middle of August,

about two weeks after the hearing date.  Id.  His pain wakes him in the night,

making it difficult to get a full night's sleep.  AR67.  If he knows he has to go

out of the house the next day, he may not sleep at all the night before because

of the anticipatory anxiety.  AR67.

Mr. Hendrickson experiences some difficulty in following instructions due

to loss of concentration.  AR64.  He testified his ability to carry out simple

instructions would vary on a case-by-case basis.  AR65.  If he was given more

---

[35] The numbers in brackets are printed using the referenced font sizes.

complex instructions, or 3-4 instructions at one time, he might be able to carry them out if they were written down, but he "would be worried about it." Id.

Mr. Hendrickson finds it really difficult to go out in public or to be around people. Id. Most days he does not leave his house. Id. He could deal with a supervisor one-on-one, but the idea of dealing with a lot of coworkers or members of the public "scares me to death." Id.

He takes prescription Venlafaxine and Gabapentin for pain and anxiety. AR66. He takes Claritin to try to keep his eyes from accumulating too much matter. Id. He takes Aleve and Tylenol, Pepto-Bismol and Tums. AR66-67. Mr. Hendrickson testified he did not like to walk long distances or stand for a long time due to his weight. AR56. He tries to walk his dogs around the block, maybe a half mile or a mile if he is feeling really ambitious. AR73-74. Sitting was fine. AR67. He can climb and descend stairs, but has labored breathing afterward. Id. Kneeling is very uncomfortable. Id. Stooping is hazardous as he often has poor vision and misses things and trips. Id.

His hands are shaky and he cannot see well enough to do fine work. AR68. As an example, he explained he can button his shirt, but cannot color within the lines. Id. When brushing his teeth, Mr. Hendrickson has to manually hold his lips shut because he cannot hold them shut with any pressure on his own. Id.

Around the house, Mr. Hendrickson said he can cook basic things like macaroni and cheese, ramen noodles, and hot dogs in the microwave. Id. He will sometimes have a family member drive him to the grocery store where he

22

enters and gets out as soon as possible.  AR69.  If he has to wait in line he generally starts almost panicking.  Id.  Recently, with his new medicine, he made it to church for the first time in a while, but does not attend any other groups or clubs.  Id.  Typically, Mr. Hendrickson testified he has 2-3 days per week where his symptoms are so bad he cannot leave the house.  Some weeks it is more than 2-3 days.  Id.

Most of Mr. Hendrickson's prior work experience was customer service, but he had one job that was production work.  AR70.  He stated he could not return to production work because he could not concentrate and would not feel safe operating any heavy equipment.  Id.

Mr. Hendrickson does not drive as he feels he would be putting himself and others in danger if he did.  AR63.  He has not driven a car since May, 2013.  Id.  The ALJ asked Mr. Hendrickson why he did not drive.  AR70.  He responded that he really could not see out of his left eye, which meant half of his field of vision was not available to him.  AR70-71.  He testified he would be afraid he would fail to see someone on the left side and he would hit them.  AR71.  No doctor had prohibited Mr. Hendrickson from driving, but Dr. Hill had indicated he might "pull his [driver's] license" if the keratoconus progressed further.  Id.  The last time Mr. Hendrickson had seen Dr. Hill was January, 2016, (six months prior to the hearing).  Id.

Dr. Hill had recommended a hard contact for Mr. Hendrickson's right eye (at the hearing he had a soft contact for that eye) as well as for the left eye.  AR71.  Avera had told Mr. Hendrickson he needed to pay $770 for each hard

contact for each eye.  AR71-72.  At the time of the hearing, he was in the

process of trying to save up money to buy hard contacts, but did not have the

money yet.  AR72.  He applied to Avera for financial help with the contacts, but

he was told he needed to come up with the money up front first.  Id.

### 2. The Vocational Expert's Testimony

Thomas Audet testified at the ALJ hearing as well.  The ALJ asked

Mr. Audet to assume a hypothetical person with Mr. Hendrickson's past work

experience and the following limitations:

- can lift and carry 20 pounds occasionally and 10 pounds frequently;

- can stand or walk for two hours in an eight-hour day;

- can sit for six hours in an eight-hour day;

- can occasionally climb ramps and stairs, but should never climb ladders, ropes, or scaffolds;

- can occasionally balance, stoop, kneel, crouch, and crawl;

- should never be exposed to unprotected heights or dangerous heavy machinery;

- can understand, remember, and carry out simple tasks;

- is limited to simple work-related decisions;

- is limited to tolerating changes in a simple work setting;

- can tolerate occasional interaction with coworkers and supervisors, but no interaction with the public.

AR77-78 (HYPOTHETICAL #1).

Given this assumed hypothetical person, the ALJ asked Mr. Audet if that person could perform any of Mr. Hendrickson's prior work. AR78. Mr. Audet said "no." Id.

The ALJ then asked whether the hypothetical person could perform any other work. Id. Mr. Audet testified the person could do the job of electronics worker at the light exertional level. Id. The job was unskilled and had Dictionary of Occupational Titles (DOT) number 726.687-010. In Minnesota, Iowa, North Dakota and South Dakota, Mr. Audet testified 1,500 of these jobs were available, with 40,000 such jobs available nationally. Id.

Mr. Audet also testified there were sedentary positions the hypothetical person could perform. AR79. The person could be a final assembler (DOT 713.687-018), of which there were 300 jobs regionally, 10,000 to 12,000 nationally. Id.

The ALJ then asked Mr. Audet to assume the limitations from the first hypothetical, and then to assume the additional limitation that the person could not do any job which required good depth perception on the left side. Id. (HYPOTHETICAL #2). Mr. Audet said that would eliminate the job of electronics worker. Id. He then stated the position of jewelry preparer would fit the hypothetical as would the job of "charger." AR80. There were approximately 300 charger positions available regionally, and 10,000 nationally. Id.

The ALJ then asked Mr. Audet to assume all the limitations from the first and second hypotheticals, and add to them the limitation that the person could

not do work involving a computer or television screen unless the person could have the ability to increase the font if reading was involved. Id. (HYPOTHETICAL #3). Mr. Audet testified all the jobs he previously laid out would still fit the hypothetical. Id.

The ALJ then asked what if the person could not reliably see small objects. AR80-81 (HYPOTHETICAL #4). In that case, Mr. Audet testified, none of the previous jobs he described could be performed by the hypothetical person. AR81. Mr. Audet then testified in response to a question from Mr. Hendrickson's lawyer that if the hypothetical person had to miss work for 2-3 days per month he would not be able to perform any of the jobs the expert previously described. Id.

**D.    Post-Hearing Interrogatories**

**1.    Interrogatories to Thomas Audet, the VE**

In post-hearing interrogatories, the ALJ posed a new hypothetical to the VE. AR370. In that hypothetical, the ALJ asked the VE to consider a hypothetical person with the following attributes and abilities:

- person has the past work experience of Mr. Hendrickson;

- person has at least a high school education and was born February 18, 1982;

- person is able to communicate in English;

- can lift and carry 20 pounds occasionally and 10 pounds frequently;

- can stand or walk for two hours in an eight-hour day;

- can sit for six hours in an eight-hour day;

- can occasionally climb ramps and stairs, but should never climb ladders, ropes, or scaffolds;

- can occasionally balance, stoop, kneel, crouch, and crawl;

- should never be exposed to unprotected heights, moving mechanical parts, dust, odors, fumes, pulmonary irritants, or extreme cold or heat;

- may frequently be exposed to humidity and wetness;

- may occasionally operate a motor vehicle;

- is able to avoid ordinary hazards in the workplace such as boxes on the floor, doors ajar, and approaching vehicles and people;

- is able to differentiate differences in shape and color of small objects such as screws, nuts and bolts;

- is able to view a computer screen [no qualifications on this ability];

- is unable to read very small print or ordinary newspaper or book print.

AR370 (HYPOTHETICAL #5). There were no limitations in the hypothetical about one's ability to concentrate, follow instructions, persist, work around others, tolerate changes, or have contact with the public. Id. There were no limitations in the hypothetical about any need to take a 1- to 3-minute break once an hour to remove and clean one's contacts. Id.

The VE answered by interrogatory that a hypothetical individual such as the one described above would not be able to perform any of Mr. Hendrickson's past work. AR371. However, the VE answered the hypothetical person could perform the unskilled jobs of: (1) preparer (DOT 700.687-062) of which there were 10,000 to 12,000 jobs nationally; (2) charger II (DOT 700.687-026) of

27

which there were 10,000 jobs nationally; and (3) lens inserter (DOT 713.687-026) of which there were 8,000 jobs nationally.  AR371.

The ALJ then posed yet another hypothetical to the VE:

-       person has the past work experience of Mr. Hendrickson;

-       person has at least a high school education and was born February 18, 1982;

-       person is able to communicate in English;

-       can lift and carry 20 pounds occasionally and 10 pounds frequently;

-       can stand or walk for two hours in an eight-hour day;

-       can sit for six hours in an eight-hour day;

-       can occasionally climb ramps and stairs, but should never climb ladders, ropes, or scaffolds;

-       can occasionally balance, stoop, kneel, crouch, and crawl;

-       can understand, remember, and carry out simple tasks;

-       is limited to simple work-related decisions and is limited to tolerating the changes in a simple work setting;

-       can tolerate occasional interaction with coworkers and supervisors but no interaction with the public;

-       should never be exposed to unprotected heights, moving mechanical parts, dust, odors, fumes, pulmonary irritants, or extreme cold or heat;

-       may frequently be exposed to humidity and wetness;

-       may occasionally operate a motor vehicle;

-       is able to avoid ordinary hazards in the workplace such as boxes on the floor, doors ajar, and approaching vehicles and people;

-       is able to differentiate differences in shape and color of small objects such as screws, nuts and bolts;

-    is able to view a computer screen [no qualifications on this ability];

-    is unable to read very small print or ordinary newspaper or book print.

AR373 <u>(HYPOTHETICAL #6)</u> (additions to Hypothetical #5 highlighted).

As to Hypothetical #6, the VE said the proposed person would not be able to perform any of Mr. Hendrickson's past work.  AR373.  The VE also stated that this proposed person could perform the jobs described in response to Hypothetical #5.  AR374.

The ALJ then posed yet another hypothetical to the VE:

-    person has the past work experience of Mr. Hendrickson;

-    person has at least a high school education and was born February 18, 1982;

-    person is able to communicate in English;

-    can lift and carry 20 pounds occasionally and 10 pounds frequently;

-    can stand or walk for two hours in an eight-hour day;

-    can sit for six hours in an eight-hour day;

-    can occasionally climb ramps and stairs, but should never climb ladders, ropes, or scaffolds;

-    can occasionally balance, stoop, kneel, crouch, and crawl;

-    can understand, remember, and carry out simple tasks;

-    is limited to simple work-related decisions and is limited to tolerating the changes in a simple work setting;

-    can tolerate occasional interaction with coworkers and supervisors but no interaction with the public;

-    should never be exposed to unprotected heights, moving

mechanical parts, dust, odors, fumes, pulmonary irritants, or extreme cold or heat;

- may frequently be exposed to humidity and wetness;

- may occasionally operate a motor vehicle;

- is able to avoid ordinary hazards in the workplace such as boxes on the floor, doors ajar, and approaching vehicles and people;

- is able to differentiate differences in shape and color of small objects such as screws, nuts and bolts;

- is able to view a computer screen [no qualifications on this ability];

- is unable to read very small print or ordinary newspaper or book print; and

- requires an approximately three-minute break every hour to clean his eye or contact lens.

AR375 (HYPOTHETICAL #7) (addition to Hypothetical #6 highlighted).

As to Hypothetical #7, the VE said the proposed person would not be able to perform any of Mr. Hendrickson's past work. AR376. The VE also stated that this proposed person could perform the same three jobs identified in Hypothetical #5.

As to his answer based on Hypothetical #7, the VE acknowledged there were conflicts between his answer and the DOT. AR377. He explained:

Taking a 3 minute break every hour is not addressed in the DOT/SCO, but if someone were productive and on task for ½ hour segments and took a short 1 to 2 minute break to stand or stretch they could still do these jobs. Taking a 3 min[ute] break every hour would be a similar situation and would allow a person to be able to perform these jobs. This is based on my experience and contacts with employers.

AR377.

Finally, the ALJ posed yet another hypothetical:

- person has the past work experience of Mr. Hendrickson;

- person has at least a high school education and was born February 18, 1982;

- person is able to communicate in English;

- can lift and carry 20 pounds occasionally and 10 pounds frequently;

- can stand or walk for two hours in an eight-hour day;

- can sit for six hours in an eight-hour day;

- can occasionally climb ramps and stairs, but should never climb ladders, ropes, or scaffolds;

- can occasionally balance, stoop, kneel, crouch, and crawl;

- can understand, remember, and carry out simple tasks;

- should never be exposed to unprotected heights, moving mechanical parts, dust, odors, fumes, pulmonary irritants, or extreme cold or heat;

- may frequently be exposed to humidity and wetness;

- may occasionally operate a motor vehicle;

- is able to avoid ordinary hazards in the workplace such as boxes on the floor, doors ajar, and approaching vehicles and people;

- is able to differentiate differences in shape and color of small objects such as screws, nuts and bolts;

- is able to view a computer screen [no qualifications on this ability];

- is unable to read very small print or ordinary newspaper or book print;

- requires a three-minute break every hour to clean his eye or contact lens.

AR378 (HYPOTHETICAL #8).  This hypothetical differed from #7 in that it

described no mental or behavioral limitations related to working with others,

ability to follow instructions, or adapt to changes in the work routine.

Compare AR378 with AR375.

As to Hypothetical #8, the VE said the proposed person would not be

able to perform any of Mr. Hendrickson's past work.  AR373.  The VE also

stated that this proposed person could perform all the same jobs identified in

his answer to Hypothetical #5.  AR379.  Again, he acknowledged a conflict

between his answer and the DOT, providing the same explanation as he had in

connection with his answer to Hypothetical #7.  Compare AR379 with AR377.

## 2.      Interrogatories to John L. Alpar, M.D., an Ophthalmologist

The ALJ provided Dr. Alpar with copies of the exhibits introduced at the

hearing in Mr. Hendrickson's case and asked him to answer a series of

questions based upon his review of the exhibits.  AR708.

In answering the interrogatories, Dr. Alpar stated that he "looked at the

case from a purely opthalmological [sic] point of view . . . not taking into

consideration any of the clients [sic] other physical and mental problems."

AR723.  Dr. Alpar stated he listened to a recording of the testimony from the

hearing.  Id.  He stated what he heard was "all subjective and very little to do

with visual acuity, visual field, visual efficiency.  What I heard was outside my

expertise, and belonged to psychiatry, pain management, ect. [sic]."  Id.

Dr. Alpar confirmed that Mr. Hendrickson suffers from keratoconus and

Bell's palsy.  AR723.  Dr. Alpar explained keratoconus is a progressive disease,

with the speed and severity of the decline being greatly variable. AR724. The treatment for keratoconus can include ultraviolet cross linking, in which a drop of dye is placed in the eye and radiated with ultraviolet light. Id. The treatment is supposed to strengthen the cornea, bringing it more in line with the normal. Id. If there is corneal scarring or vascularization, the cornea can be replaced. Id. Because the disease changes the shape of the cornea, eye glasses are not effective in correcting vision. Id. Hard contacts can be more effective, but Dr. Alpar acknowledged the cost of such contacts is expensive. Id.

Dr. Alpar characterized Mr. Hendrickson's keratoconus as on "the milder side," noting that there is no documentation of corneal scarring or corneal neovascularization which would increase the risk of graft rejection [of a corneal transplant] and therefore increase the failure of the operation. Id. In Mr. Hendrickson's most recent eye exam, his vision in his left eye was 20/80 pinholeing to 20/60 ÷ 2 and 20/250 pinholeing to 20/25.[36] Id.

The "most recent" eye exam referenced by Dr. Alpar would have been Mr. Hendrickson's January, 2016, visit to Dr. Hill because Dr. Alpar issued his opinion on September 15, 2016. AR728. Therefore, Dr. Alpar did not have a

---

[36] Pinholeing presumably refers to a vision test described by the American Academy of Ophthalmology as the pinhole visual acuity test. See https://www.aaao.org/image/pinhole-visual-acuity. In the test, the patient dons an eye shield which has several small holes in it in a starburst pattern. Id. The holes allow light rays to reach the retina without the interference of optical problems of the eye. Id. The test allows the doctor to screen for uncorrected refractive errors and disorders of the ocular media. Id.

chance to review the last eye exam for Mr. Hendrickson which is in the administrative record dated November 7, 2016.  AR741-47.  In that exam, Dr. Vance Thompson noted Mr. Hendrickson's keratoconus was showing "definite progression."  AR747.

Dr. Alpar also addressed Mr. Hendrickson's Bell's palsy, noting there was documentation for the disease appearing first on the left, later on the right, and later still with a flare-up on the left.  Id.  Dr. Alpar noted the records did not document the severity of the condition or any measurement of the exposure of Mr. Hendrickson's left eye due to the effect of the palsy on closing his eyelids. Id.  Like keratoconus, Bell's palsy can vary in its severity and duration. AR725.  Bell's palsy affects the "Vth cranial nerve, called the Facial Nerve," "one branch of [which] innervates the eyelids and therefore the eyelid cannot close."[37]  Id.  "This means; [sic] the eyeball is subjected to exposure of varying degrees, causing mild or severe discomfort, mucous formation, constant tearing of the eye, the tears running down the cheek but not wetting the cornea, therefore the danger for dry or drying out of the cornea, ulcer formation, infections, etc is real."  Id.  During some phases of the disease, contacts cannot be worn, but when they can, the wearing time is "reduced and the maintenance of the lens becomes more cumbersome."  Id.  Sometimes the eyelid problem resolves itself, but other times the effect is permanent.  Id.  When permanent, sometimes surgery becomes necessary to permanently narrow the space

---

[37] The court assumes Dr. Alpar meant "seventh" rather than "Vth."  An MRI of Mr. Hendrickson's brain documents the involvement of his "seventh cranial nerve" in regards to his Bell's palsy.  See AR616.

between the eyelids.  Id.  Likewise, the disfiguration of the patient's lips due to

Bell's palsy can be minimal or severe, potentially causing difficulty with speech

and drooling.  Id.

As great as the variation in duration and severity of Bell's palsy is, there

is "even greater variation of the pain which is very often a subjective one."

AR726.  Dr. Alpar noted it was clear from the medical records that

Mr. Hendrickson "was taking a great number of different pain killers of variable

strengths."  Id.  Listening to Mr. Hendrickson's testimony, Dr. Alpar stated he

"developed a great deal of anxiety and depression, which very likely contributes

to the pain," but he acknowledged this was not within his area of expertise.  Id.

"Just looking at the eye condition, he was certainly handicapped because he

had to clean his contact lens, clean his eye, etc."  Id.  Regarding Bell's palsy,

Dr. Alpar stated "[t]here is no document showing that [Mr. Hendrickson's] near

vision could be increased from the 24 or 28 font size to a 20 or even 14 font

size."  AR727

Unlike the VE, Dr. Alpar opined Mr. Hendrickson's eye conditions should

not prevent him from returning to work as a phone customer service provider

within his own home as long as he could take a few minutes off every hour or

so to clean his eye.  Id.  Dr. Alpar noted that Mr. Hendrickson became "a

recluse because he felt that going outside would expose him to ridicule and

humiliate him."  Id.  Dr. Alpar said he did not wish to ignore Mr. Hendrickson's

pain and stated "I am not a pain specialist…"  AR726-27.  In Mr. Hendrickson's

"very complex case," Dr. Alpar opined, "it would be essential that his disability,

based on his pain level, would be evaluated by psychologists and pain specialists." AR727. Based on the visual impairments only, Dr. Alpar opined Mr. Hendrickson was handicapped, but not disabled. Id.

## E. ALJ's Decision[38]

### 1. Step One

On January 6, 2017, the ALJ issued a decision denying benefits to Mr. Hendrickson. AR27-83. At step one of the analysis,[39] the ALJ found that Mr. Hendrickson had not engaged in substantial gainful activity (SGA) since May 28, 2013, his alleged date of onset of disability. AR29.

### 2. Step Two

At step two, the ALJ found Mr. Hendrickson's keratoconus, Bell's Palsy, obesity, headaches, obstructive sleep apnea, and anxiety were severe impairments. AR30. The ALJ found his mood disorder and depression were not severe, but stated that it considered all of his mental impairments in forming its decision. Id.

### 3. Step Three

At step three, the ALJ found Mr. Hendrickson's impairments or combinations of impairments did not meet or equal a listed impairment described at 20 C.F.R. Part 404, Subpart P, Appendix 1. AR30, 32. The ALJ

---

[38] Both parties' recitation of the ALJ's decision was skeletal and insufficient to allow this court to evaluate the issues raised on appeal. Therefore, the description of the ALJ's opinion is almost solely the court's.

[39] The five-step sequential analysis is described *infra* in greater detail in this opinion.

found Mr. Hendrickson had mildly restricted activities of daily living.  Id.  He had moderate difficulties in social functioning, concentration, persistence, or pace.  Id.  The ALJ found he had no episodes of decompensation of extended duration.  Id.  Because Mr. Hendrickson did not have "marked limitations in at least two areas, or one "marked" limitation and "repeated" episodes of extended-duration decompensation, the ALJ held Mr. Hendrickson did not meet the paragraph B criteria.  AR32.  As to paragraph C criteria, the ALJ stated paragraph C required Mr. Hendrickson to prove a "complete inability to function independently outside the area of [his] home."  AR33.  Because Mr. Hendrickson had not proved this, the ALJ held he also failed to establish the paragraph C criteria.  Id.  Although the ALJ found Mr. Hendrickson did not establish the existence of paragraph B or C criteria at steps two and three, the ALJ stated it included the degree of limitations the court found in paragraph B in its mental RFC at steps four and five.[40]  Id.

### 4.  Step Four

At step four, the ALJ determined Mr. Hendrickson retained the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. §§ 404.1567(b) & 416.967(b) with the following limitations:

- can lift and carry 20 pounds occasionally and 10 pounds frequently;

- can stand or walk for six hours in an eight-hour day;

---

[40] The ALJ also discussed whether Mr. Hendrickson's obesity, obstructive sleep apnea, keratoconus, Bell's palsy and headaches met or equaled a listing.  See AR31.  Mr. Hendrickson does not take issue with that part of the ALJ's decision in this appeal, so that discussion by the ALJ is not set forth herein.

- can sit for six hours in an eight-hour day;

- can occasionally climb ramps and stairs, but should never climb ladders, ropes, or scaffolds;

- can occasionally balance, stoop, kneel, crouch, and crawl;

- can understand, remember, and carry out simple tasks;

- is limited to simple work-related decisions;

- is limited to tolerating changes in a simple work setting;

- can tolerate occasional interaction with coworkers and supervisors, but no interaction with the public;

- should have no exposure to hazards such as unprotected heights and moving mechanical parts; dust, odors, fumes, and pulmonary irritants; or extreme cold or heat;

- may frequently have exposure to humidity and wetness;

- can occasionally operate a motor vehicle;

- can avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar, and approaching people or vehicles;

- is able to differentiate differences in shape and color of small objects, such as screws, nuts, and bolts;

- is able to view a computer screen; however, is unable to read very small print or ordinary newspaper or book print; and

- requires an approximate three-minute break every hour to clean his eye or contact lens.

AR33. This physical and mental RFC adopted by the ALJ corresponds to Hypothetical #7 described above, propounded to the VE for the first time in post-hearing interrogatories.

 In arriving at Mr. Hendrickson's mental and physical RFC, the ALJ accurately set forth the test for evaluating the credibility of subjective reports of

symptoms by a claimant.  Compare AR34-35 with SSR 16-3p, 20 C.F.R.

§ 404.1529, and Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

Specifically, the ALJ concluded Mr. Hendrickson had medically determinable

physical and mental impairments shown by medically acceptable clinical and

laboratory diagnostic techniques that could reasonably be expected to produce

his pain and other symptoms.  AR33-34, 38.  Therefore, the ALJ evaluated the

evidence in the record to determine the intensity, persistence, and limiting

effects of Mr. Hendrickson's symptoms as shown by credible evidence.

AR34-38.  This included an accurate recounting of Mr. Hendrickson's own

testimony as to his symptoms and activities.  AR34-35.  It also included a

discussion of the medical treatment records, including Dr. Chester-Adam's

psychiatric evaluation in August, 2016, and Dr. Sandbulte's[41] opinion letter

written in December, 2016.  AR35-38.

The ALJ then embarked on a five-page single-spaced evaluation of the

credibility of Mr. Hendrickson's statements and a weighing of the various

medical opinions in the record.  AR38-42.

As to Mr. Hendrickson's description of his vision limitations, the ALJ

found that description not entirely consistent with the evidence.  AR38.  The

ALJ stated [erroneously] that there was little or no documented problems with

Mr. Hendrickson's right eye, although the ALJ previously cited a record from

Dr. Vance Thompson from November, 2016.  AR38.  Dr. Thompson noted in

that record that Mr. Hendrickson's "visual acuity seems to be declining in his

_____

[41] The ALJ's opinion incorrectly refers to Dr. Sandbulte as Dr. Sandbultz.

right eye." AR747. The ALJ, citing an earlier 2014, record, stated Mr. Hendrickson's vision in his right eye was 20/25. AR653.

Regarding Mr. Hendrickson's vision impairment, the ALJ stated he had not exhausted his treatment options and, seemingly laying the fault for this at Mr. Hendrickson's doorstep, the ALJ stated he had free coverage through Avera. AR38.

The ALJ discounted Mr. Hendrickson's statement that he could not drive, noting that no doctor had restricted his ability to drive. AR39. The ALJ accepted Dr. Alpar's opinion that Mr. Hendrickson's vision problems were not disabling. AR39.

The ALJ held Mr. Hendrickson's obesity was not inconsistent with the level of light exertional work. AR39.

The ALJ characterized Mr. Hendrickson's facial pain from his Bell's palsy as a "fairly recent development that has not been ongoing for a year." AR39.

As to Mr. Hendrickson's mental impairments, the ALJ discounted his description of his symptoms, noting that there was a paucity of treatment records, he did not seek professional mental health help until 2016, and that prior to that, he received only prescriptions for anxiety from his primary care physicians. AR39. In any case, the ALJ asserted that it factored Mr. Hendrickson's pain, anxiety, and concentration issues into his mental RFC. AR39.

The ALJ recounted Mr. Hendrickson's description of how he typically spent his days and concluded "this [is not] the most that the claimant can do." AR39.

Turning to the medical evidence, the ALJ noted restrictions by doctors in the record to work half days in May, 2014, and to take some time off in July, 2014, but the ALJ characterized each of these doctors' orders as temporary in nature. AR40. The ALJ noted Dr. Alpar, whose opinion the ALJ adopted, did not impose these restrictions but instead opined Mr. Hendrickson could return to his past work. AR40.

As to Dr. Lageson's opinion on Mr. Hendrickson's physical and mental RFC, the ALJ gave "little weight." AR40. The ALJ faulted Dr. Lageson's physical RFC by noting it failed to include any limitations due to Mr. Hendrickson's visual impairments. AR40-41. In addition, the ALJ found Mr. Hendrickson's exertional impairments to be greater than Dr. Lageson; whereas Dr. Lageson opined Mr. Hendrickson could lift and carry 50 pounds occasionally and 20 pounds frequently, the ALJ concluded he could lift and carry only 20 pounds occasionally and 10 pounds frequently. Id.

As to Dr. Lageson's mental RFC, the ALJ stated it was inconsistent with the record as a whole. AR40. The ALJ pointed out that, until 2016, Mr. Hendrickson had only sought limited treatment for his anxiety from primary care physicians in the form of prescribed medications. Id. Also, whereas Dr. Lageson opined Mr. Hendrickson's chronic pain and anxiety made it very difficult for him to remember and concentrate, Dr. Chester-Adam found

Mr. Hendrickson had "grossly intact memory and fair attention." Id. In addition, the ALJ stated a significant impairment in memory and concentration as opined by Dr. Lageson was inconsistent with Mr. Hendrickson's description of his daily activities of listening to books, doing household chores, talking to family, and attending church. Id.

The ALJ also accorded "little weight" to the opinion of Dr. Sandbulte. AR41. Although Dr. Sandbulte purported to opine about Mr. Hendrickson's mental state going back "for years" into the past, in fact she had only seen Mr. Hendrickson for a few months before rendering her opinion. Id. The ALJ also indicated Dr. Sandbulte's opinion that Mr. Hendrickson's anxiety and depression was "agonizing" for years was inconsistent with Mr. Hendrickson's history of being able to hold consistent employment for many years. Id. In addition, the ALJ also held that the opinion was inconsistent with Mr. Hendrickson's self-described activities of going for walks and car rides with others. Id. Finally, the ALJ faulted Dr. Sandbulte for not providing any specific opinion as to Mr. Hendrickson's work-related functioning. Id.

The ALJ found Mr. Hendrickson's RFC did not allow him to perform any of his past relevant work. AR42.

### 5.    Step Five

At step five, relying on the testimony from the VE in part, the ALJ found that Mr. Hendrickson's RFC would allow him to perform other work which existed in significant numbers "nationally." AR43. Specifically, the ALJ concluded Mr. Hendrickson could perform the jobs of "jewelry preparer" (DOT

700.687-002), "charger II" (DOT 700.567-026, really DOT 700-687-026),[42] and "lens inserter" (DOT 713-687-026). AR43. Because the ALJ concluded there were jobs that exist "in significant numbers in the national economy" which Mr. Hendrickson could still perform, the ALJ found he was not disabled. AR44.

## F.     Mr. Hendrickson's Assignments of Error

Mr. Hendrickson raises four main issues and four sub-issues for a total of 7 issues. Those issues are as follows:

1.     Did the ALJ err by failing to obtain professional assistance to assess the impact of Mr. Hendrickson's mental impairments?

2.     Did the ALJ err in assessing Mr. Hendrickson's credibility?

3.     Did the ALJ correctly determine Mr. Hendrickson's RFC?

4.     Did the ALJ's decision at step five comply with the law?

a.     Did the ALJ err in determining a significant number of the jobs listed at step five existed?

b.     Did the record lack substantial evidence to support the mental RFC after the ALJ dismissed the functional limitation opinions of the psychiatrist and psychologist?

c.     Did the jobs found by the ALJ at step five match the RFC?

---

[42] It appears there was a typographical error in the ALJ's written opinion. The VE testified live at the hearing and also testified via interrogatory that, in his opinion, Mr. Hendrickson's RFC would allow him to perform the job the VE called "charger" or "charger II," to which the VE assigned the following identical DOT number both in his live testimony and in his interrogatory: DOT 700.**687**-026. AR80, 371. The ALJ cited the job of "charger II" in its opinion, but mistakenly identified the DOT number as 700.**567**-026. Because the ALJ was clearly adopting the VE's opinion as to the charger/charger II position, and because the VE identified the same DOT number for the job of charger/charger II in both his live testimony and his interrogatory, the court assumes the ALJ meant to cite to the same DOT number as the VE but made a typographical error in drafting its written opinion.

      d.     Did the jobs identified by the ALJ require accommodation?

The Commissioner asserts substantial evidence in the record supports the ALJ's decision respecting each of the above issues. The Commissioner accordingly asks this court to affirm its decision below.

## DISCUSSION

**A.    Standard of Review.**

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); <u>Minor v. Astrue</u>, 574 F.3d 625, 627 (8th Cir. 2009). Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Klug v. Weinberger</u>, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." <u>Scott ex rel. Scott v. Astrue</u>, 529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered, citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. <u>Minor</u>, 574 F.3d at 627. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005); <u>Woolf</u>

v. Shalala 3 F.3d 1210, 1213 (8th Cir. 1993).  If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed.  Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993).  "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record."  Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed.  Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g).  Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis.  Erroneous interpretations of law will be reversed.  Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998) (citations omitted).  The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court.  Smith, 982 F.2d at 311.  Where "[s]everal errors and uncertainties in the opinion [occur], that individually might not warrant remand, in combination create sufficient doubt about the ALJ's rationale for denying" benefits, remand for further proceedings before the agency is warranted.  Willcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008).

**B.      The Disability Determination and the Five-Step Procedure.**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.[43] The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. The five steps are as follows:

Step One: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, she is not disabled and the inquiry ends at this step.

Step Two: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 404.1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

Step Three: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment

_____

[43] Although Mr. Hendrickson has applied for both Title II and Title XVI benefits, for the sake of simplicity, the court herein cites to only the regulations applicable to Title II where the Title XVI regulation is identical. It is understood that the provisions of both Titles are applicable to Mr. Hendrickson's application. Any divergence between the regulations for either Title will be noted.

meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett v. Heckler, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 404.1520a(c)(2).

Step Four: Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

Step Five: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 404.1520(f).

## C.    Burden of Proof.

The plaintiff bears the burden of proof at steps one through four of the

five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994);

Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof

shifts to the Commissioner at step five. Clark v. Shalala, 28 F.3d 828, 830 (8th

Cir. 1994). "This shifting of the burden of proof to the Commissioner is neither

statutory nor regulatory, but instead, originates from judicial practices."

Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting at step

five has also been referred to as "not statutory, but . . . a long standing judicial

gloss on the Social Security Act." <u>Walker v. Bowen</u>, 834 F.2d 635, 640 (7th Cir. 1987).  Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." <u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004).

### D.  Did the ALJ Err by Failing to Obtain Professional Assistance to Assess the Impact of Mr. Hendrickson's Mental Impairments?

On August 16, 2016, Mr. Hendrickson was diagnosed with generalized anxiety disorder following a psychiatric evaluation.  AR739.  From there, he was referred to a licensed psychologist who diagnosed major depressive disorder (recurrent, severe), and mood disorder NOS.  AR12, 748.  The DDS[44] psychologists did not review this evidence created for the first time in 2016 because the DDS psychologists issued their opinions in February and April of 2015.  AR93, 121.

Mr. Hendrickson asserts the ALJ dismissed the opinion of treating physician Dr. Lageson regarding his mental RFC.  AR40.  Mr. Hendrickson also asserts the ALJ dismissed the opinion of Dr. Sandbulte, a treating psychiatrist

---

[44] The Commissioner delegates initially to state agencies, known as Disability Determination Services (DDS) to make decisions concerning disability applications.  20 C.F.R. § 404.1503.  The DDS evaluates the application at the first two stages of the process, known as the initial stage and reconsideration. 20 C.F.R. § 404.900(a)(1) – (2).  The Commissioner uses 54 DDSs to review and make decisions on claimants' applications.  If the DDS denies the request initially and on reconsideration, the claimant can appeal the decision for a *de novo* hearing before an ALJ.  20 C.F.R. § 404.900.  The same five-step sequential evaluation is used by both DDS and the ALJ.  20 C.F.R. § 404.1520.

source.  Because the ALJ rejected both of the treating mental health professionals' opinions, and because the DDS psychologists did not review Mr. Hendrickson's mental health records, Mr. Hendrickson asserts the ALJ had no medical evidence in the record upon which to base its mental RFC opinion. Dr. Alpar, the ophthalmologist to whom the ALJ submitted post-hearing interrogatories, stated it was essential that Mr. Hendrickson be evaluated by a psychologist and pain specialist.  The ALJ did not take Dr. Alpar up on his recommendation.

Instead, Mr. Hendrickson argues, the ALJ completed the Psychiatric Review Technique Form (PRTF) itself without input or assistance from a qualified psychologist or psychiatrist.  Mr. Hendrickson posits the ALJ had a choice of two options:  credit the treating mental health sources' opinions, or obtain a consultative evaluation to determine the effect of Mr. Hendrickson's mental impairment on his functioning.  Because the ALJ did neither of these things, Mr. Hendrickson asserts the case must be reversed.

The Commissioner disputes Mr. Hendrickson's characterization of the record.  It notes that the DDS physicians did complete PRTFs, though they determined Mr. Hendrickson did not suffer from a severe mental impairment. Because of this, the Commissioner asserts this is *not* a case where the ALJ completed the PRTF by itself in the first instance.  The Commissioner asserts there is, therefore, substantial evidence in the record to support the ALJ's decision.  The Commissioner does not dispute Mr. Hendrickson's assertion that

the DDS physicians did not have his 2016 mental health records to review at the time they rendered their opinions.

Mr. Hendrickson responds that, because the DDS psychologists stopped at step two of the five-step sequential analysis, finding Mr. Hendrickson did not suffer from a severe mental impairment, the DDS psychologists never assessed Mr. Hendrickson's mental RFC as part of the PRTF (which would have been step four had the DDS psychologists continued their analysis past step two). Therefore, Mr. Hendrickson argues the ALJ relied only on Mr. Hendrickson's own testimony--and not that of any mental health professional--in determining Mr. Hendrickson's mental RFC.

Congress has provided by statute that when making a disability determination in a case where there is evidence indicating the existence of a mental impairment, the Commissioner must make "every reasonable effort to ensure . . . that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment."  42 U.S.C. § 421(h)(1).  Section 404.1520a(a) of Title 20 of the Code of Federal Regulations states in relevant part, "when we evaluate the severity of mental impairments . . . we *must* follow a special technique at each level in the administrative review process.  We describe the technique in paragraphs (b) through (e) of this section."  See 20 C.F.R. § 404.1520a(a).  The document described in § 404.1520a is the PRTF.  Completing a PRTF is mandatory in any case in which a mental impairment is present.  Cuthrell v. Astrue, 702 F.3d 1114, 1117 (8th Cir. 2013).

The Eighth Circuit has suggested, but not held, that failure to complete a PRTF is reversible error, but the court has "left the door open to harmless-error analysis." Id. at 1118. Thus, the court has found failure to complete a PRTF to be harmless error where there was no credible evidence of a severe mental impairment. Id. (citing Nielson v. Barnhart, 88 Fed. Appx. 145, 147 (8th Cir. 2004) (per curiam); Cakora v. Barnhart, 67 Fed. Appx. 983, 985 (8th Cir. 2003) (per curiam); Fountain v. R.R. Retirement Bd., 88 F.3d 528, 532 (8th Cir. 1996)).

Where the ALJ finds a severe mental impairment at step two, however, failure to complete a PRTF is reversible error. Cuthrell, 702 F.3d at 1118.

In Montgomery v. Shalala, 30 F.3d 98, 99 (8th Cir. 1994), the claimant (unlike Mr. Hendrickson in this case), alleged a mental impairment initially in his application. A PRTF was completed by a state agency medical consultant at the initial and reconsideration levels. Id. At the hearing level before the ALJ, however, no PRTF was completed. Id. at 99-100. This was urged as reversible error before the district court. Id. The district court, acknowledging precedent which suggested the ALJ's failure to complete a PRTF at the hearing level was grounds for reversal, nevertheless found the error to be harmless because the ALJ included the claimant's mental impairments in the hypothetical given to the vocational expert. Id. at 100. The Eighth Circuit reversed and remanded. Id.

The court noted that the claimant's mental impairment included a condition that affected his perception of pain arising from bona fide physical

conditions and which affected his social and occupational impairment far in excess of what physical findings would suggest. Id. The ALJ's description of the claimant's mental condition in the hypothetical that the claimant suffered from "some depression" for which he had received treatment inadequately conveyed the nature and extent of the mental impairment. Id. Providing guidance on remand, the court noted that the ALJ was authorized under the regulations to complete the PRTF himself, but was also bound to make "every reasonable effort" to obtain an opinion from a qualified psychiatrist or psychologist as to the medical portion of the case and the claimant's mental RFC. Id. at 101.

In the Cuthrell case, the ALJ found Cuthrell had a severe impairment of a closed-head injury, with symptoms that were mental in nature. Cuthrell, 702 F.3d at 1117. No PRTF had been performed. Id. at 1116. Because of the finding of a severe mental impairment, the court held it was not harmless error for the ALJ to have failed to complete a PRTF. Id. at 1118.

Similarly, in a case decided in this district, where there had been no PRTF completed prior to the hearing before the ALJ, the court reversed because there was no evidence the ALJ made "every reasonable effort" to obtain an assessment through a PRTF from a qualified psychologist or psychiatrist. See Houseweart v. Astrue, 2011 WL 1256829 at **24-25 (D.S.D. Mar. 7, 2011).

In Mr. Hendrickson's case, the ALJ found he had a severe mental impairment of anxiety at step two. AR30. The DDS physicians performed partial PRTFs prior to the hearing before the ALJ, but their review was based

on incomplete records.  Notably, until 2016, Mr. Hendrickson had never been given a formal diagnosis of anxiety, mood disorder, and depression, and the DDS psychologists did not have these diagnoses or mental health treatment records to review at the time they completed their PTRFs.

The ALJ performed the PRTF itself in its written decision.  AR31-32.  However, the ALJ cited to no medical evidence—its PRTF was based solely on Mr. Hendrickson's own assessment of his abilities and his daily activities.  AR32-33.  Mr. Hendrickson therefore argues that the PRTF is a layperson's (the ALJ's) nonexpert opinion based on another layperson's (Mr. Hendrickson's) nonexpert opinion.  Not exactly.

Although the ALJ cited no medical evidence in support of its step two and step three PRTF analysis, it did say that it gave further consideration to the paragraph B criteria of the PRTF at step four when formulating Mr. Hendrickson's mental RFC.  AR33.  At step four, the ALJ considered *and credited* Dr. Chester-Adam's assessment of Mr. Hendrickson's concentration, attention, and memory.  AR40.  Therefore, the PRTF at step four is based in part on expert medical evidence from a psychologist.  Id.

However, at the step two and three evaluation of the PRTF, Mr. Hendrickson is correct that the ALJ relied almost solely on a written function report Mr. Hendrickson had completed October 4, 2014, two years before the ALJ hearing.  AR32-33, 312-19.  In that report, Mr. Hendrickson stated he prepares meals once or twice per month.  AR314.  He mows, does dishes, does laundry, removes snow, and vacuums, needing no help from

others to complete these tasks.  Id.  He stated he goes outside 1-2 hours most days.  AR315.  He wrote that he shops one hour a week for food, clothes, and household items.  Id.  He also wrote that he could pay his bills, count change, and handle his checking and savings accounts.  Id.

Regarding social activities, Mr. Hendrickson wrote in his function report that he talks with others and goes for walks and rides with others "as often as I can."  AR316.  He stated he attended church "on a regular basis."  AR316.  He stated he has no problems getting along with family, friends, neighbors, or others.  AR317.  He stated he gets along well with authority figures.  AR318.

Regarding his ability to function in the workplace, Mr. Hendrickson reported on his function report that the only activity adversely affected was his vision.  AR317.  He did not check the boxes indicating he had any difficulty concentrating, remembering, completing tasks, understanding, or following instructions.  Id.  He did say he had anxiety of crowds.  AR318.

There were some discrepancies between Mr. Hendrickson's 2014 written function statement and his 2016 testimony at the hearing, but not many.  He clarified that the meals he cooks are basic microwave meals like macaroni and cheese, ramen noodles, and hot dogs.  AR68.

He reiterated his anxiety when around groups of people, like a lot of coworkers or members of the public, but also reiterated he could deal with people like a supervisor one-on-one.  AR65.  In the function report he stated he attended church "regularly," while at the hearing he testified he had recently attended church for the first time in a long while due to the ameliorative effects

54

of some new medications he was taking.  Compare AR316 with AR69.  He testified at the hearing that the anxiety brought about by the knowledge he has to leave the house the next day will rob him of sleep the night before.  AR67.

At the hearing--contrary to his function report--he testified that he has difficulty concentrating and following instructions.  Compare AR64-65 with AR318.  However, he may simply not have filled out the written function report carefully or his vision may have been poor enough he did not see certain checkboxes because in the written function report he also failed to mark that he wore glasses or contacts.  AR318.  The medical records show he continuously wore contacts and/or glasses.  There would be no motive for Mr. Hendrickson to dissemble on this point.

Despite these discrepancies, Mr. Hendrickson maintained at the hearing that his major impediment to work was his poor vision due to the keratoconus and residual effects of Bell's palsy.  AR59.  This was, also, clearly the import of his written function report.  AR312-19.  He never testified at the hearing that anxiety was the reason he quit any of his past jobs, contrary to Dr. Sandbulte's report.  AR56-59.  Instead, he testified he quit jobs to be closer to family and, then, due to the effects of Bell's palsy.  AR58-59.

The pitfalls of relying on a claimant's own assessment of the impact of his mental impairments are illustrated by the case of Parsons v. Heckler, 739 F.2d 1334 (8th Cir. 1984).  In Parsons, the claimant had severe mental impairments.  Id. at 1336-39.  The ALJ found the claimant not disabled at step five, finding he could no longer perform past relevant work, but could perform

other jobs in the national economy.  Id. at 1339-40.  The claimant lacked insight into the severity of his mental impairment, consistently over presenting his ability to function.  Id. at 1340.  For example, in a year when he earned $30, he reported earning $2,000.  Id.  When he was employed as a janitor, he reported he was employed as a manager.  Id.  He presented himself as possessing strong employment potential, but was fired from his last job—after which he earned less than $300 over a two-year period.  Id.  At step five, when considering whether there were other jobs in the national economy the claimant could do, the court stated the ALJ "must take into account evidence indicating that the claimant's true functional ability may be substantially less than the claimant asserts or wishes."  Id. at 1341.

This case is more nuanced than Parsons.  Although Mr. Hendrickson had complained of anxiety over a long period of time in his medical records and was taking anti-anxiety drugs, there were long stretches of time he did not complain of anxiety symptoms and did not seek medical care for that condition; he did not list any mental impairments on his application for disability (AR302).  In many of his medical records for treatment of his Bell's palsy, he attributes his anxiety solely to the chronic pain he experienced from the palsy or to his inability to sleep due to the pain.  AR662, 670-71, 676, 680.

The evidence of Mr. Hendrickson's anxiety in the record is not strong.  The first record documenting a complaint of anxiety is dated July 31, 2012, in which he told his primary medical care provider that he was concerned about anxiety and racing thoughts.  AR517.  He stated he worried about "random

things." Id. Zoloft and Klonopin were first prescribed for Mr. Hendrickson's anxiety on this date. AR518.

On a follow up visit on August 8, 2012, Mr. Hendrickson stated his anxiety had been worse and that the Zoloft and Klonopin did not seem to help. AR516.

Despite Mr. Hendrickson's assertion on August 8, 2012, of the ineffectiveness of the medications, the next documented complaint of anxiety in the record is three and a half years later on February 26, 2016. AR680. On that date, he told his medical provider he felt anxious all the time, a symptom he attributed to not getting enough sleep due to the pain from Bell's palsy. Id. Venlafaxine, a medication for nerve pain and for depression, was prescribed at this time.[45] AR681.

On his next doctor visit two months later, April 22, 2016, Mr. Hendrickson reported that the Venlafaxine was somewhat helpful for his anxiety and asked that the dosage be increased, which it was. AR676-77.

On May 17, 2016, Mr. Hendrickson again reported feeling anxious all the time, a fact he again attributed to not getting enough sleep due to chronic pain from the Bell's palsy. AR669-70. Mr. Hendrickson reiterated this exact same

---

[45] Mr. Hendrickson asserts that "severe anxiety" was noted on May 28, 2014. However, on that date, Mr. Hendrickson was not complaining of symptoms of anxiety or seeking treatment for anxiety. Anxiety was simply noted in the record as part of Mr. Hendrickson's past medical history. AR472. At the time, Mr. Hendrickson was seeking treatment for positional dizziness. AR471. It was noted he was still taking prescription Zoloft as of this date. AR471-72.

complaint on May 31, 2016. AR662. None of his anxiety medications were changed at either of these appointments. AR663, 671.

Mr. Hendrickson's next treatment record for anxiety is post-ALJ hearing on August 16, 2016, when Dr. Chester-Adam conducted a psychiatric evaluation and diagnosed Mr. Hendrickson with generalized anxiety disorder. AR735-36. Notably, Dr. Chester-Adam opined that with a combination of therapy and medications, Mr. Hendrickson could possibly re-enter the workforce. AR739. Dr. Chester-Adam re-prescribed Klonopin for Mr. Hendrickson. Id.

A line chart of anxiety complaints in this record would look like this:

```
7/12    8/12                                    2/16   4/16   5/16   8/16

 |     |                                          |     |    ||     |
```

This case differs from the Parsons case and from Freideman v. Berryhill, 2018 WL 1010356 (D.S.D. Feb. 1, 2018), adopted 2018 WL 1009272 (D.S.D. Feb. 20, 2018). In both of those cases, there was reason to believe on the face of the record that the claimant was an unreliable narrator as to his mental impairments. Parsons did not assert any mental impairments despite saying he earned $2,000 from employment whereas he really earned $30, and stating he had strong employment potential but was fired from his last job after earning less than $300 over two years. Parsons, 739 F.2d at 1339-40. Likewise, Freideman had received mental health care for a long time, had been prescribed a therapy dog for 10 years, could not handle his money or pay bills, said he got along with people even though he had been fired from jobs for

failing to get along with others, but did not assert any mental impairments before the Commissioner.  Freideman, 2018 WL 1010356 at *23.  Here, there is no reason to believe Mr. Hendrickson was an unreliable narrator.  The only thing Mr. Hendrickson's case seems to have in common with Parsons and Freideman is that all three claimants failed to list any mental impairments on their disability applications.

The record demonstrates that Mr. Hendrickson complained of anxiety twice within two weeks in 2012 (July 31 and August 8) and then did not complain about anxiety symptoms again until February, 2016, 42 months later.  In February, 2016, he was prescribed a new anti-depression drug, and two months later he reported he was better and asked if the dosage of the drug (Venlafaxine) could be increased, which it was.  There are then two more complaints of anxiety within two weeks of each other on May 17 and 31, 2016.  And then there is the psychiatric evaluation post-hearing, which diagnosed anxiety, but opined there was hope for Mr. Hendrickson to return to the workforce with therapy and medication.

Mr. Hendrickson simply did not complain consistently about anxiety symptoms.  When he did, medication was prescribed which presumably—or actually--addressed those symptoms because there are long stretches of time where Mr. Hendrickson did not complain about anxiety symptoms or seek medication changes for his anxiety.  In addition, the psychiatrist who evaluated him, Dr. Chester-Adam, opined he could possibly return to work with a combination of therapy and medications.  Therefore, the expert's view is in

accord with—not in conflict with—Mr. Hendrickson's own view of the non-disabling effect of his anxiety.

Mr. Hendrickson's counsel points out the not-terribly-sympathetic attitude of Dr. Rector toward Mr. Hendrickson's anxiety symptoms (AR517— "The cure for his anxiety is to get back to meaningful work each day."), and seems to suggest that Dr. Rector's refusal to refer Mr. Hendrickson to a mental health professional may be an explanation for why Mr. Hendrickson's anxiety is not addressed in more detail in this administrative record. The court agrees that Dr. Rector's attitude seems "old school" in the worst sense.

But the court notes Mr. Hendrickson switched from Dr. Rector as his primary care provider to Avera on July 16, 2014. AR638. There is no suggestion the Avera providers were anything other than attentive and empathetic. Nevertheless, there is still a 3.5-year gap in which Mr. Hendrickson neither complained of anxiety symptoms nor sought any change in his anxiety medications or dosages. During 18 months of this 42-month gap, Mr. Hendrickson was under the care of Avera providers, not Dr. Rector.

Mr. Hendrickson argues the fact the ALJ found he had severe mental impairments imposed a duty on the ALJ to make "every reasonable effort" to obtain an assessment of Mr. Hendrickson's mental impairments from a qualified psychologist or psychiatrist. Houseweart, 2011 WL 1256829 at **24-25. But the ALJ has latitude under the regulation to complete the PRTF itself. See 20 C.F.R. § 404.1520a(e)(4). This presents a close case because the facts

of this case are somewhat unique: (1) there was a partial PRTF completed by the DDS psychologists, but those PRTFs were based on incomplete medical records, and did not include an assessment of Mr. Hendrickson's mental RFC; (2) the ALJ's PRTF is not based on any medical evidence but solely on Mr. Hendrickson's self-reported abilities and activities of daily living, but those self-reports appear to be congruent with reality; (3) the ALJ disregarded to a great degree the opinion from one mental health professional who treated Mr. Hendrickson, but credited portions of the other mental health provider; and (4) the records are sparse as to the impairing effect of Mr. Hendrickson's mental disabilities.

Finally, the ALJ made concessions for Mr. Hendrickson's mental impairments in arriving at his mental RFC. The ALJ concluded Mr. Hendrickson should be shielded from interaction with the public and should have interaction with coworkers and supervisors only occasionally. AR33. Furthermore, the ALJ decided he should be limited to simple work-related decisions, could tolerate only changes in a simple work setting, and could understand, remember, and carry out simple tasks. Id.

The court notes the timing of events in this case. The hearing before the ALJ took place on July 29, 2016. AR51. The crucial mental health records and diagnoses came into being on August 16, 2016, and thereafter, which was *after* the hearing. AR735. These records were timely submitted to the ALJ, and Mr. Hendrickson's attorney alerted the ALJ at the hearing that Mr. Hendrickson had been referred for a psychiatric evaluation which would

61

take place a couple of weeks after the hearing date. AR54. The ALJ issued its decision January 6, 2017. AR24. In its decision the ALJ discussed at length these post-hearing records. AR38 (discussing Exh. 14F [AR735-39] and Exh. 16F [AR748-53]).

The ALJ gave little weight to medical doctor Lageson's opinion as to Mr. Hendrickson's mental impairments, but generally credited Dr. Lageson's opinion as to physical capabilities. AR40-41. The ALJ found Lageson's mental RFC opinion was inconsistent with the record as a whole (he had only recently sought mental health treatment aside from taking medication), inconsistent with Mr. Hendrickson's reported daily living activities, and inconsistent with Dr. Chester-Adam's mental status report of Mr. Hendrickson at the time she administered the initial psychiatric evaluation. Id.

The ALJ similarly gave little weight to Dr. Sandbulte's opinion regarding Mr. Hendrickson's mental impairments. AR41. The ALJ noted Dr. Sandbulte had only treated Mr. Hendrickson very recently, but purported to offer opinions as to his mental functioning going back years in the past prior to Dr. Sandbulte knowing him. Id. The ALJ also found Dr. Sandbulte's opinion to be inconsistent with the record evidence because Mr. Hendrickson had never sought professional mental health care prior to 2016; he was able to work at SGA levels prior to May, 2013; he continued to work at non-SGA levels in 2013 and 2014; and he was able to engage in some degree of activity and socializing with family and friends. Id. Finally, the ALJ noted Dr. Sandbulte did not give specific opinions as to work-related functioning. Id.

Were this issue the sole issue presented in this appeal—the issue of the ALJ's failure to obtain a PRTF from a mental health professional--the decision whether to affirm or remand would be difficult. However, because there are other issues requiring remand as discussed elsewhere in this opinion, the court directs the ALJ to consider whether to obtain a consultative PRTF from a qualified psychiatrist or psychologist upon remand and to address specifically the "every reasonable effort" language of the statute, especially in light of Dr. Alpar's expressed opinion that Mr. Hendrickson's complaints of pain may be interconnected with mental impairments. See <u>Montgomery</u>, 30 F.3d at 100-01.

### E. Did the ALJ Err in Assessing Mr. Hendrickson's Credibility? [46]

Mr. Hendrickson asserts the ALJ improperly discounted his subjective complaints. In determining whether to fully credit a claimant's subjective complaints of symptoms, the Commissioner engages in a two-step process: (1) first, is there an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms; and (2) if so, the Commissioner evaluates the claimant's description

---

[46] The court notes that as of March 28, 2016, the Commissioner discontinued the use of the term "credibility" in its sub-regulatory policy. <u>See</u> SSR 16-3p (which superseded SSR 96-7p). The Commissioner made clear that in evaluating a claimant's subjective complaints of symptoms, it was not evaluating the claimant's character. <u>Id.</u> The court uses the term "credibility" herein because it is prevalent in the case law that has developed. Nevertheless, like the Commissioner, this court emphasizes that "credibility" is not interchangeable with "character."

of the intensity and persistence of those symptoms to determine the extent to which the symptoms limit the claimant's ability to work.  See SSR 16-3p; 20 C.F.R. § 404.1529.  Here, the ALJ found Mr. Hendrickson had medically determinable impairments that could reasonably be expected to produce his symptoms, so the analysis is focused on the second part of the inquiry.

In evaluating the second prong of the analysis, an ALJ must consider several factors.  The factors to consider include:  whether such complaints are supported by objective medical findings, whether the claimant has refused to follow a recommended course of treatment, whether the claimant has received minimal medical treatment, whether the claimant takes only occasional pain medications, the claimant's prior work record, observation of third parties and examining physicians relating to the claimant's daily activities; the duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  A claimant's subjective complaints of pain may be discredited only if they are inconsistent with the evidence as a whole.  Id.

With regard to the factor of a claimant's daily activities, the ALJ must consider the "quality of the daily activities and the ability to sustain activities, interest, and relate to others *over a period of time* and the frequency, appropriateness, and independence of the activities."  Wagner, 499 F.3d at 852 (citing Leckenby v. Astrue, 487 F.3d 626, 634 (8th Cir. 2007)) (emphasis in

original).  Although activities which are inconsistent with a claimant's testimony of disabling pain reflect negatively on the claimant's credibility, the ability to do light housework and occasional visiting with friends does not support a finding that the claimant can do full-time work in the "competitive and stressful conditions in which real people work in the real world."  Reed, 399 F.3d at 923 (quoting Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989)).

An ALJ need not methodically discuss every Polaski factor so long as the factors are all acknowledged and considered in arriving at a conclusion.  Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008).  If adequately supported, credibility findings are for the ALJ to make.  Id. (citing Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cor. 2006)).  Generally, the ALJ is in a better position to evaluate credibility of witnesses and courts on judicial review will defer to the ALJ's credibility determinations so long as they are supported by substantial evidence and good reasons.  Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).  See also Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (stating "[w]e will not substitute our opinion for that of the ALJ, who is in a better position to assess credibility.").  The Eighth Circuit has said "in many disability cases, there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain is."  Woolf, 3 F.3d at 1213.

In Mr. Hendrickson's case, the ALJ set forth his testimony regarding pain, symptoms and activities of daily living and then stated the ALJ did "not see this as the most that the claimant can do."  AR39.  Mr. Hendrickson argues

before this court that the ALJ failed to carry its obligation under <u>Polaski</u> to articulate *why* it disbelieved him.

The Commissioner points to a discussion by the ALJ over 5 pages of its opinion which she asserts constitutes the credibility evaluation. AR33-38. In particular, the ALJ noted Mr. Hendrickson had sought only limited treatment for his vision, despite the fact his treatment was free and he had not exhausted his treatment options. AR38, 64, 654. Furthermore, the ALJ noted Hendrickson's limited treatment for Bell's palsy, each incidence of which resulted in admitted improvement. AR39, 619, 692, 861. The ALJ noted Mr. Hendrickson did not see an eye doctor from January to November, 2016. AR39, 653, 747. And, as noted before, the ALJ found Mr. Hendrickson's failure to seek mental health treatment until after the ALJ hearing to be indicative of the fact his symptoms did not become severe enough to warrant treatment until then. AR39, 735. Finally, the Commissioner points out that the ALJ discussed Mr. Hendrickson's daily living activities. AR35, 39, 74, 314-16.

Mr. Hendrickson asserts the fact he held 14 jobs in 14 years is evidence he had to quit all these jobs due to anxiety. However, his own testimony in the record is that his anxiety did not become a problem until he developed Bell's palsy for the first time in 2013. His last work at an SGA level was in 2013, so anxiety cannot have been the reason for leaving employment which occurred prior to 2013. Finally, he did not identify anxiety as the reason he left any of his jobs. AR58-59.

The ALJ discounted Mr. Hendrickson's description of his vision impairments by stating: (1) he had no problems with his right eye, (2) he had failed to exhaust his treatment options for his keratoconus, and (3) the ALJ seemingly laid the fault for this at Mr. Hendrickson's doorstep by stating that he had "free coverage through Avera." AR38. This was error.

The ALJ had before it the November, 2016, record from Dr. Vance Thompson, an ophthalmologist surgeon. AR747. When Dr. Thompson examined Mr. Hendrickson, he noted that his "visual acuity seems to be declining in his right eye." Id. The ALJ asserted, citing a 2014 medical record, that Mr. Hendrickson's vision in his right eye was 20/25. AR38. But Dr. Hill documented vision of 20/80 in Mr. Hendrickson's right eye in January, 2016. AR653.

As we know from Dr. Alpar, it is to be expected that Mr. Hendrickson's vision in both eyes will worsen because keratoconus is a progressive disease: the normal course is for a person with keratoconus to experience worsening vision until a corneal implant becomes necessary. AR724-27. Of course, Dr. Alpar did not have the benefit of Dr. Thompson's November, 2016, exam when Dr. Alpar responded to interrogatories in September, 2016.

The ALJ also made much of the somewhat infrequent visits Mr. Hendrickson made to eye doctors. But there is nothing in the record suggesting treatment of keratoconus requires more frequent visits than what Mr. Hendrickson attended. The notation at the end of Dr. Thompson's November, 2016, record indicates that Dr. Thompson wanted to see

67

Mr. Hendrickson again in 6 to 9 months. AR747. That is almost exactly the same interval between the January visit to Dr. Hill and the November visit to Dr. Thompson. There is nothing in the record to suggest that Mr. Hendrickson failed to attend eye appointments on a schedule other than what his doctors recommended.

Furthermore, the treatment for keratoconus as outlined by Dr. Alpar in order of proceeding is first, hard contacts; then cross-linking; and as a last resort, corneal transplant. Id. These are all expensive options. As Mr. Hendrickson testified, his hard contacts were going to cost $770 a piece. AR72. Contrary to the ALJ's suggestion that Avera would pay for this cost, Mr. Hendrickson testified that Avera told him he needed to come up with the money for the contacts himself first, and then Avera would see what it could do to help him. AR72. As of the hearing date, Mr. Hendrickson did not have the hard contacts his doctor recommended because he had no way to pay for them. AR72.

Mr. Hendrickson testified that Avera had tried to help him with some expenses by giving him coupons, but this is a far cry from free medical care and free medical devices from all providers. This court takes judicial notice that Dr. Thompson, to whom Mr. Hendrickson was referred for possible cross-linking, is not part of the Avera network. Furthermore, when Dr. Thompson saw Mr. Hendrickson, he remarked in his records that Mr. Hendrickson had no apparent way to pay for his services. AR747. There is no evidence in the

record that cross-linking is available through the Avera network or that, even if it were, Mr. Hendrickson would receive that procedure free of charge.

Dr. Gregory Hill, a doctor of optometry with Avera, noted in his January 6, 2016, treatment record that Mr. Hendrickson had no job, no health insurance, and no car. AR654. Although the ALJ was quick to jump on Dr. Hill's statement that Mr. Hendrickson needed to exhaust the treatment options for keratoconus before considering himself disabled (AR38), Dr. Hill wrote *before* that statement in the same medical record that Mr. Hendrickson "First has to determine how to afford Tx [treatment]." AR654.

When Mr. Hendrickson saw Dr. Larson, treatment was also impacted by Mr. Hendrickson's inability to afford some of the devices she recommended. AR432, 435.

The Commissioner has provided guidance to ALJs for evaluating a claimant's subjective complaints of symptoms. See SSR 16-3p. With regard to a claimant's infrequency of treatment or failure to follow prescribed treatment, the Commissioner counsels that it will not find this factor to be contrary to the claimant's described symptoms unless the Commissioner first contacts the claimant for an explanation regarding lack of treatment, or asks the claimant for such an explanation at the ALJ hearing. Id. The Commissioner specifically acknowledges a claimant may not obtain or follow prescribed treatment because he "may not be able to afford treatment and may not have access to free or low-cost medical services." Id. The Commissioner recognizes that inability to afford treatment coupled with lack of access to free community

resources is a justifiable reason for not following treatment recommendations. See SSR 82-59.

Where an ALJ believes a claimant does not have justifiable reasons for refusing recommended treatment, the ALJ is supposed to advise the claimant *before* a determination of eligibility of benefits is decided; that way, the claimant can elect to undergo the treatment if desired. Id. This prophylactic measure is necessary for fundamental fairness because, once a disability application is denied, the claimant may not later undertake to follow the treatment recommendation and revise the adverse determination. Id. An ALJ may consider whether an examining medical source determines that the claimant was malingering in assessing the credibility of the claimant's testimony as to subjective complaints of pain. Clay v. Barnhart, 417 F.3d 922, 930 n.2 (8th Cir. 2005) (two psychologists' findings that claimant was "malingering" cast suspicion on the claimant's credibility).

"If a claimant truly has no access to health care, then the absence of such care would not tend to disprove her subjective complaints of pain." Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004). However, in evaluating a claimant's subjective complaints of pain, it is permissible for the ALJ to consider whether he sought out treatment available to indigents. Id.

Here, there is no evidence in the record that hard contacts, cross-linking or corneal transplants were available free of charge to Mr. Hendrickson, despite Mr. Hendrickson's attempts to obtain free or reduced cost treatment. In fact, the opposite evidence was presented. It was error for the ALJ to discount

Mr. Hendrickson's subjective description of the effects of his keratoconus because he had not followed every avenue for treatment—treatment he could not afford.

The ALJ characterized Mr. Hendrickson's facial pain from his Bell's palsy as a "fairly recent development that has not been ongoing for a year." AR39. This is clearly an incorrect and unreasonable assessment of the medical record before the ALJ. As such, the ALJ's mischaracterization of the record does not serve as a valid reason to discount Mr. Hendrickson's complaints of pain.

Mr. Hendrickson's complaints of pain are evident since he experienced his first episode of Bell's palsy in May, 2013, his alleged date of onset of disability. AR521-22. Thereafter, medical records continuously document his persistent complaints of eye and facial pain on the left side of his face and headaches related to Bell's palsy:

- October, 2013 (AR449, 452);

- November, 2013 (AR423, 429-30, 440, 449);

- December, 2013 (AR426);

- February, 2014 (AR388-95, 412);

- May, 2014 (AR472);

- July, 2014, RIGHT side Bell's palsy and associated pain (AR638);

- December 2, 2015 (AR691-92, left side facial pain an 8 out of 10);

- December 30, 2015 (AR687-90, head pain 6 out of 10, doctors attribute to the aftermath of 2 episodes of Bell's palsy, leaving Hendrickson with severe post-herpetic neurologic left facial pain);

●January 16, 2016 (AR683-85);

●February 26, 2016 (AR679-81);

●April 22, 2016 (AR676);

●May 7, 2016 (AR668-71); and

●May 31, 2016 (AR660-64).

Furthermore, from the time of his first episode of Bell's palsy up to and including the date of the ALJ hearing, Mr. Hendrickson has been prescribed, and has taken, a variety of serious prescription medications with significant side effects to attempt to address his pain. Those medications include prednisone (AR479), acyclovir (AR479),[47] Tramadol (AR478, 679-81), Gabapentin (AR676), trazadone, nortriptyline (AR668-71), Flexeril (AR478, 652), meloxicam (AR652), clonazepam (AR516), and Imitrex (AR660-64). There is no evidence in this record that Mr. Hendrickson's care providers viewed his complaints of pain as any form of malingering. On remand, the ALJ is to reconsider its credibility decision regarding Mr. Hendrickson's complaints of pain in light of this substantial record evidence.

The ALJ was dismissive of Mr. Hendrickson's mental impairments, noting that he had not sought care from a mental health professional until 2016. The history of his complaints of anxiety to his doctors, regardless of their field of practice, is given above and dates back to at July 31, 2012, when

---

[47] Acyclovir is an antiviral medication. See https://webmd.com/drugs/2/drug-941/acyclovir-oral/details. Bell's palsy is thought to be caused by some combination of genetic predisposition and exposure to the herpes simplex virus.

he was prescribed Zoloft and Klonopin for anxiety. AR516-21. It appears he took anti-anxiety medication at least up to and through the date of the ALJ hearing. AR516. As discussed above, the court is recommending upon remand that the ALJ consider obtaining a PRTF from a qualified psychiatrist or psychologist. On remand, the ALJ is also directed to consider anew its credibility determinations of Mr. Hendrickson's description of the subjective effects of his anxiety.

**F.      Did the ALJ Correctly Determine Mr. Hendrickson's RFC?**

**1.      The Law Applicable to Determination of RFC**

Mr. Hendrickson asserts the ALJ failed to properly assess his mental RFC, reiterating the arguments made above regarding the lack of a PRTF from a psychiatrist or psychologist. As with the initial discussion of the PRTF issue above, the court directs the ALJ to revisit this issue in conjunction with the mental RFC. Were this the only issue presented, the court would have difficulty reversing solely on the mental RFC. As already discussed above, the record evidence of mental impairment was not strong and the ALJ did incorporate some mental limitations into the mental RFC. Nevertheless, the ALJ should evaluate this issue in light of Dr. Alpar's opinion about the potential mental genesis of Mr. Hendrickson's pain and the other record evidence. Montgomery, 30 F.3d at 100-01.

Mr. Hendrickson also asserts the ALJ failed to properly assess his visual limitations when arriving at his physical RFC. Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental

limitations." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered). "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability. 20 C.F.R. § 404.1545(b)." Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013). The formulation of the RFC has been described as "probably the most important issue" in a Social Security case. McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all of a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are nonsevere. Lauer, 245 F.3d at 703; Social Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996). Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on *all* the relevant evidence . . . a claimant's residual functional capacity is a medical question."[48] Lauer, 245 F.3d at 703 (citations omitted) (emphasis added). Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical

_____

[48] Relevant evidence includes: medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations. See SSR 96-8p.

evidence that addresses the claimant's ability to function in the workplace." Id. (citations omitted).

"The RFC assessment must always consider and address medical source opinions." SSR 96-8p. If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." Id. "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight." Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ. Id. at n.8. Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. Id. However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source. Id.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8p. However, the ALJ "must make every

reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . . In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id.

Finally, "to find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (cleaned up); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

### 2.    Application of the Law to the ALJ's Decision

Mr. Hendrickson points out that his testimony was he could read print on a computer if he increased the font size to a 24 or 26. The ALJ did not reject this testimony, yet also suggested he could view a computer unaided and un-blown-up with his right eye. AR38. Again, as already discussed, the ALJ overlooked important evidence from Dr. Hill in January, 2016, and from Dr. Thompson in November, 2016, that Mr. Hendrickson's right eye was also impaired, though not as bad as his left. The ALJ's finding that

Mr. Hendrickson could see normally with his right eye is not supported by substantial evidence in the record.

The correction of the vision in Mr. Hendrickson's left eye, meanwhile, was limited to a four- or five-hour window with his hard contact in place. AR403, 408, 423, 434, 446. The ALJ did not address the medical evidence related to this limited left eye vision.

Also, the ALJ indicated in its RFC that Mr. Hendrickson could see small objects such as screws, bolts, and nuts. The Commissioner argues on appeal that "small" is a "self-evident" term and that Mr. Hendrickson had the ability to see "small" things. The court notes that screws come in all sizes, from the minute screws in the hinges of eye glasses to the giant screws that anchor heavy artwork and mirrors on walls. Likewise bolts and nuts come in all sizes. While Mr. Hendrickson may be able to differentiate a 3-inch bolt that is 1/2 – inch thick from a nut similarly sized to go with such a bolt, he did not and does not have the vision necessary to differentiate small items of jewelry as described in further detail below.

The Commissioner relies heavily on Dr. Alpar's decision to support the ALJ's vision assessment. Dr. Alpar's opinion suffers from the fact that he did not have the benefit of Dr. Thompson's November, 2016, vision assessment. In addition, Dr. Alpar did not acknowledge or address the limitation of Mr. Hendrickson's effective use of contacts in his left eye to a four- or five-hour window.

Dr. Alpar stated, "There is no document showing that his [Mr. Hendrickson's] near vision could be increased from the 24 or 28 font size [that he testified he needs] to a 20 or even a 14 font size." AR727. In other words, Dr. Alpar *credits* Mr. Hendrickson's testimony that he cannot read at a 14 or even a 20 font size. He requires a 24 or 28 font size.[49]

Dr. Alpar's syntax and sentence structure is a bit odd in the sentence from his report reprinted above. He is from Hungary, so English is probably not his first language. AR706. He graduated high school in 1944, graduated from college in 1945, and obtained a medical degree in 1949 after only four more years of schooling. Id. Nevertheless, the court interprets his statement in his report to mean: there is no document that contradicts Mr. Hendrickson's own testimony that he needs 24 or 26 font size in order to read text on a computer.

Dr. Alpar's expert opinion is directly contrary to the ALJ's RFC formulation that Mr. Hendrickson was capable of reading text on a computer unaided without substantially increasing the font size. It is also contrary to the ALJ's formulation that he can see and differentiate "small" objects.

Mr. Hendrickson also alleges he suffers from depth-perception problems that the ALJ failed to take into consideration. The Commissioner asserts there is no objective evidence documenting any such impairment. When Mr. Hendrickson complained of depth-perception problems, all objective testing

---

[49] Dr. Alpar misquotes Mr. Hendrickson's testimony. Mr. Hendrickson testified he needs font at a 24 or *26* size in order to be able to read text on a computer, not 24 or 28. AR73.

of his hand-eye coordination was normal.  AR689.  The court agrees with the

Commissioner on this issue.  There is no objective documentation in the record

that Mr. Hendrickson suffers from depth-perception problems, although there

is documentation that he complained of such problems on one occasion.

The ALJ's misconstruing of the medical evidence related to vision is

compounded by the ALJ's erroneous credibility evaluation of Mr. Hendrickson's

testimony regarding his vision, as discussed in detail above.  The court

remands for the ALJ specifically to reconsider Mr. Hendrickson's physical RFC

as to vision.

**G.      Did the ALJ's Decision at Step Five Comply with the Law?**

   **1.      Did the ALJ Err in Determining a Significant Number of the
             Jobs Listed at Step Five Existed?**

The ALJ determined there were three jobs that "exist in significant

numbers in the national economy" that Mr. Hendrickson's RFC allowed him to

perform:  (1) jewelry preparer/preparer, DOT 700.687-062; (2) charger/charger

II, DOT 700.687-026; and (3) lens inserter, DOT 713.687-026.  See AR43-44.

Mr. Hendrickson asserts the ALJ applied the wrong standard by determining

that significant numbers of these three jobs existed "nationally."

Mr. Hendrickson asserts that the controlling statute requires the ALJ to find

significant numbers of these jobs exist in Mr. Hendrickson's region or in

several regions of the country.  The Commissioner asserts the ALJ applied the

correct standard.  This court has addressed this issue multiple times in the

last year.

Section 423(d) of Title 42 provides in pertinent part as follows:

(d) "Disability" defined

> (1) The term "disability" means—
>> (A) Inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months;

\* \* \*

> (2) For purposes of paragraph (1)(A)—
>> (A) An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. ***For purposes of the preceding sentence*** (with respect to any individual), ***"work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.***

See 42 U.S.C. § 423(d)(1)(A) and (2)(A) (emphasis added).

What is clear from the above emphasized language is that "work which exists in the national economy" is a term of art in Social Security law. It does not mean work in the entire United States. Instead, it means "work which exists in significant numbers either in the *region* where such individual lives or in *several regions* of the country." Id. (emphasis added). Now, what does that definition mean exactly?

The Commissioner argues it need not establish jobs exist in Mr. Hendrickson's immediate area. While that is true, it begs the question. The Commissioner *does* have to show that jobs exist in Mr. Hendrickson's "region" or in "several regions of the country." We know from the statutory language that "region" does *not* mean "immediate area," but defining what a term does not mean is not all that helpful in defining what it *does* mean.

The Commissioner's regulation, 20 C.F.R. § 404.1566, is likewise unhelpful. It does not define "region." Id. It says that "region" is not equal to "immediate area." Id. at (a)(1).

In Barrett v. Barnhart, 368 F.3d 691, 692 (7th Cir. 2004), the court held the "other regions" language that Congress used in § 423(d)(2)(A) was intended to prevent the Social Security Administration from denying benefits on the basis of isolated jobs existing only in very limited numbers in relatively few locations outside the claimant's region. This sentiment is paralleled in the Commissioner's regulation where it states: "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered 'work which exists in the national economy.' We will not deny you disability benefits on the basis of the existence of these kinds of jobs." 20 C.F.R. § 404.1566(b).

The dictionary defines "region" as "a large, indefinite part of the earth's surface, any division or part." Webster's New World Dictionary, at 503 (1984). "A subdivision of the earth or universe." OED (3d ed. Dec. 2009). We know from Congress' statute and from the Commissioner's regulation, that "region"

81

does not mean the entire country.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 1566(b).  The dictionary defines "region" as an indefinite parcel that is part of the whole, and so must be something less than the whole.

The court concludes, as it must, that "national" as used in § 423(d)(2)(A) does not truly mean "nationwide."  Such is the nature of agency law.  Instead, at step five, the ALJ must find that jobs the claimant can do exist in substantial numbers in the claimant's own "region" (something less than the whole nation), or in "several regions" (several parts that, together, consist of something less than the whole nation).  Id.

The Commissioner cites Johnson v. Chater, 108 F.3d 178 (8th Cir. 1997), in support of the assertion that in the Eighth Circuit, "national" does mean the entire country.  But that is not what Johnson says.  In the Johnson case, the claimant appealed the issue whether the VE's testimony was sufficient to prove that there were jobs existing in substantial numbers in the national economy.  Id. at 178.  The VE had testified that Johnson could perform sedentary, unskilled work such as being an addresser or document preparer.  Id. at 179.  The VE said that there were 200 such positions in Iowa and 10,000 such positions nationwide.  Id.  Johnson took issue with whether 200 positions in his home state of Iowa constituted "substantial" numbers of jobs.  Id. at 180 n.3.  The court rejected Johnson's argument and held that the VE's "testimony was sufficient to show that there exist a significant number of jobs in the economy that Johnson can perform."  Id. at 180.

Although Johnson does not stand for the proposition which the Commissioner attributes to it, Johnson saves the ALJ's opinion in part in this case regarding this issue. In Johnson, the VE testified to the number of jobs available in the claimant's *region* (in that case, his state), and also the number of jobs available in the whole country. Id. at 179. Here, as to two of the three jobs identified by the ALJ at step five (charger/charger II and preparer/jewelry preparer), the VE testified to the number of jobs available *regionally and nationally.* AR79-80. As to the third job, lens inserter, the ALJ established the number of jobs only at the national level and never identified how many of these jobs existed regionally or in several regions. AR79-80, 371.

If the ALJ's decision had been based solely on the lens inserter job, this court would reverse. As discussed above, the ALJ is required to find significant numbers of jobs exist in the claimant's region or in several regions of the country. 42 U.S.C. § 423(d)(1)(A) and (2)(A). The VE never gave any testimony either at the hearing or later in his answers to the ALJ's interrogatories about the availability of lens inserter jobs in Mr. Hendrickson's region or in several regions of the country. AR371 (8,000 lens inserter jobs available in the "national economy"). Therefore, there is insufficient evidence in the record to affirm the ALJ's finding that sufficient numbers of lens inserter jobs exist. Because of this, the court does not consider the lens inserter job with regard to any of the other step five arguments raised by Mr. Hendrickson in this appeal.

However, the VE *did* identify the numbers of regional jobs available in the other two jobs. He testified there were 300 jewelry preparer jobs regionally

(defined as Minnesota, Iowa, North and South Dakota), and 10,000 to 12,000 jobs nationally.  AR78-79.  He also testified there were 300 charger jobs regionally and 10,000 such jobs nationally.  AR80.

In this appeal, Mr. Hendrickson does not take issue with the VE's definition of "regionally."  Nor does Mr. Hendrickson dispute that 300 jobs in his region is a significant number of jobs.  Therefore, as to the ALJ's finding that significant numbers of jewelry preparer jobs and charger jobs existed in the "national economy," which we know is a term of art meaning "regionally" or in "several regions," the court affirms the ALJ.[50]

### 2. Did the Record Lack Substantial Evidence to Support the Mental RFC after the ALJ Dismissed the Functional Limitation Opinions of the Psychiatrist and Psychologist?

Mr. Hendrickson asserts the DDS physicians did not perform *any* of the PRTF because they both found he had no medically determinable mental impairment. Although set forth as a separate step five issue by Mr. Hendrickson, this issue is in fact subsumed by the other issues previously discussed.  The court remands on this issue for the same reasons discussed above.

### 3. Did the Jobs Found by the ALJ at Step Five Match the RFC?

Mr. Hendrickson argues the jobs the ALJ held he could perform are inconsistent with his visual functioning.  The issue presented is whether

---

[50] There is no requirement that the ALJ identify 3 jobs a claimant can do.  <u>See</u> 42 U.S.C. § 423(d)(1)(A) and (2)(A).  Therefore, the identification of 2 jobs is sufficient.

Mr. Hendrickson's depth perception is affected by his eye impairments and whether the RFC concluding he could differentiate and handle "small" objects was really in keeping with the medical evidence--i.e. 24- or 26-point font is much larger than pieces of jewelry or screws. The court has already decided to remand based on the ALJ's mistakes in assessing Mr. Hendrickson's credibility as to his vision and in assessing his physical RFC as to his vision. Because the ALJ's step five finding was based on those errors committed at step four, the ALJ will have to reevaluate its step five finding at any rate. The court provides the below analysis to guide the ALJ's reconsideration on remand.

The ALJ found Mr. Hendrickson could perform the jobs of charger/charger II and jewelry preparer. The DOT defines the job of Charger II as follows:

**700.687-026 CHARGER II (jewelry-silver.) alternate titles: bench hand; set-up and charger**

Prepares jewelry findings for subsequent soldering operations: Positions jewelry article on nonflammable work surface, such as asbestos board or pan of crushed emery stone. Selects findings and positions them on jewelry article, using tweezers. Places particle of solder (charge) at junction of jewelry article and finding, using brush or pick.

See www.govtusa.com/dot/dot07a.html.

The DOT defines the job of Preparer as follows:

**700.687-062 PREPARER (jewelry-silver.) alternate titles: bench hand**

Performs any combination of following tasks in preparing cast jewelry findings for further processing: Cuts, saws, or breaks off gates from jewelry castings, using shears, jeweler's saw, pliers, or foot equipped with cutting tool. Removes burrs and smooths rough edges of casting, using file or grinding wheel. Straightens

distorted castings, using foot press equipped with shaping dies. May remove plaster from castings by dipping castings in water and acid solution. May count and separate jewelry casting into containers, according to type, and marks containers with identifying information. May specialize in breaking off gates from jewelry castings and be designated Breaker-Off (jewelry-silver.).

Id.

Jewelry findings are anything on jewelry used to hook it together that is not a bead, spacer, or other ornamentation. They are teeny-tiny. To get an idea of the variety of jewelry findings and their sizes and uses, the reader may view some of these videos and web sites. See https://www.jewelrysupply.com/findings-components; https://www.youtube.com/watch?v=0lRPt0GkfBM; https://www.youtube.com/watch?v=E5-A0Rdefsc. Any person over the age of 40 with average eyesight would struggle to see and effectively manipulate these pieces. Mr. Hendrickson has likewise provided evidence of the size of jewelry findings in this record. See Docket No. 17-1 at pp. 3-5, and Docket No. 17-2 at p. 3. The extra value of the videos is one can see the findings being manipulated by human hands and truly get a flavor of their size.

For example, a crimp bead is used by threading a wire through the bead two times and using a special tool to crimp the bead, squashing the bead onto the wire and thereby securing it. A crimp bead is about the actual size of this dot: • Other fasteners include double rings and single rings, which come in varying sizes, but on average are about this size or smaller: O Single rings are opened and other loops containing ornaments such as charms are threaded

onto the loop and then the loop is closed.  Both single and double rings can be attached to a wire and used to attach to a lobster closure on the other end of the wire.  Lobster closures can come in varying sizes, but are generally close to the same size as the single or double ring.  <u>See</u> Docket No. 17-1 at p. 3.

Jewelry soldering involves the use of a hot soldering iron and produces fumes, requiring good ventilation.  To solder, you place two pieces of metal touching each other.  You then place a tiny, tiny amount of flux at the joint.  Then you take solder (a metal wire), you touch the solder to the joint of the two metal pieces, then touch it with the hot soldering iron.  Thus, to be able set something up for someone else to solder, you need to be able to see the tiny metal pieces, place them so that they are exactly touching one another, and then place the solder so that it is touching the other two pieces of metal precisely at the joint.  <u>See</u> https://www.youtube.com/watch?v=ReeiZ09DOQ8.

It is not clear from the DOT description whether a preparer also puts the drop of flux on the joint between the two metal pieces.  Suffice it to say, being a jewelry charger requires every bit as much close visual acuity of tiny pieces and the necessary hand-eye coordination to position those tiny pieces such that they are ready to be soldered as does manipulating jewelry findings.  The very fact that the DOT description requires the use of tweezers for positioning of pieces is an indication of how small the pieces are that the worker is manipulating.  <u>See</u> DOT 700.687-026.

Jewelry casting is when a mold is used to create a piece of ornamentation.  <u>See</u> https://www.youtube.com/watch?v=UQzGR8veYxg.

When a piece of jewelry comes out of a mold, there are tiny imperfections that must be buffed, sanded, or sawed off. Of course pieces of jewelry vary widely in size, but the vision required to see tiny imperfections after the casting process and remove them is beyond most mere mortals without a jeweler's glass, let alone someone like Mr. Hendrickson whose vision has been doubly reduced by keratoconus and the after effects of Bell's palsy. On remand, the ALJ is directed to consider the "real world" environment of a charger II and a jewelry preparer in deciding at step five if there are other jobs Mr. Hendrickson can do.

### 4. Did the Jobs Identified by the ALJ Require Accommodation?

The issue presented by this argument from Mr. Hendrickson is whether taking 3 minutes every hour to clean one's eye and/or contact lens constitutes an accommodation. Mr. Hendrickson has cited case law holding that if a job requires accommodation for the claimant to be able to perform the job, the ALJ cannot consider that job as one the claimant is able to perform. Docket No. 17 at p. 34 (citing Eback v. Chater, 94 F.3d 410, 411-12 (8th Cir. 1996)).

The VE acknowledged that the DOT descriptions for the jobs he identified did not address whether an employee would be allowed to clean his eye and/or contact once per hour. The VE analogized this issue to standing and stretching every hour, which he testified in his experience employers would allow. AR377.

Mr. Hendrickson disagrees with the analogy, pointing out that he would have to leave his work station and go to a location where he could wash his hands before cleaning his eyes and/or contact lens. Standing and stretching could be done at one's work station without having to leave one's work station.

Cleaning one's eye or contact could not, unless there was a sink right at the employee's work station.

Having already concluded that remand is necessary to allow the ALJ to reassess the evidence regarding Mr. Hendrickson's visual capabilities, the court need not address this issue. However, upon remand, the ALJ should carefully evaluate Mr. Hendrickson's argument as it is a cogent observation.

## H.  Type of Remand

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Mr. Hendrickson requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider his case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands. A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only

two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Buckner, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be developed, clarified and properly evaluated. See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Specifically, the ALJ must reevaluate its credibility findings en route to determining physical RFC relating to Mr. Hendrickson's vision and the jobs available to him once an RFC is formulated that appropriately sets forth his vision impairments. The ALJ must also revisit the issues of Mr. Hendrickson's credibility regarding his pain and the effect of his mental impairments on his work functioning. Therefore, a remand for further

administrative proceedings is appropriate rather than an outright award of benefits.

## CONCLUSION

Based on the foregoing facts, law and analysis, it is hereby

ORDERED that Mr. Hendrickson's motion to reverse the decision of the Commissioner [Docket No. 16] is granted. This matter is remanded to the Commissioner pursuant to sentence four, 42 U.S.C. § 405(g), for further proceedings in accordance with this order.

DATED November 14, 2018.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge